NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4622
_____

In re: AGR PREMIER CONSULTING, INC.,

Debtor

BAYER BUSINESS AND TECHNOLOGY SERVICES f/k/a Bayer Corporation and
Business Services, LLC

v.

AGR PREMIER CONSULTING, INC.; 21ST CAPITAL CORPORATION

21ST CAPITAL CORPORATION,

Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-11-cv-00803)
District Judge: Hon. Gary L. Lancaster
_____

Argued
October 18, 2013

Before: RENDELL, JORDAN and LIPEZ*, *Circuit Judges.*

(Filed: January 9, 2014)

_____

*Honorable Kermit V. Lipez, United States Court of Appeals Senior Judge for the
First Circuit, sitting by designation.

Martin F. Goldman, Esq.
15910 Ventura Boulevard – Ste. 1525
Encino, CA   91436

Ronald B. Roteman, Esq.   [ARGUED]
George T. Snyder, Esq.
Stonecipher Law Firm
125 First Avenue
Pittsburgh, PA   15222
        *Counsel for Appellant*

William E. Kelleher, Jr., Esq.   [ARGUED]
Helen S. Ward, Esq.
Cohen & Grigsby
625 Liberty Avenue
Pittsburgh, PA   15222
        *Counsel for Appellees*

Jeffrey J. Sikirica, Esq.
121 Northbrook Drive
Gibsonia, PA   15044
        *Trustee*

_____

OPINION OF THE COURT
_____


JORDAN, *Circuit Judge*.

This is a case about allocating the fallout of fraud.  AGR Premier Consulting ("AGR" or the "Debtor") fabricated invoices on which both 21st Capital Corporation ("21st Capital") and Bayer Business and Technology LLC ("Bayer") relied.  21st Capital, serving as a factor, paid AGR for those invoices fully expecting Bayer to reimburse those payments.  Bayer now argues that it never received any services from AGR in connection with the fraudulent invoices and therefore owes nothing to 21st Capital.  21st Capital, obviously, sees things differently.  And therein – amidst extraneous arguments over

2

bankruptcy law – lies the rub.  21st Capital now appeals the decision of the United States

District Court for the Western District of Pennsylvania finding it in contempt for

violating a Stipulated Order.  For the reasons that follow, we will reverse and remand.

## I.      Background[1]

### A.      Relationship Between the Parties

On August 3, 2009, several creditors of AGR, not including 21st Capital, filed an

involuntary petition for bankruptcy against AGR, pursuant to 11 U.S.C. § 303(b).  Prior

to the commencement of the bankruptcy proceedings, AGR had been in the business of

providing personnel and administrative resources to its clients, including Bayer.  Because

of its "cash flow difficulties," AGR entered into an agreement in July 2004 with 21st

Capital, an accounts receivable factor,[2] such that:

> (i) AGR provided contract personnel to Bayer and invoiced Bayer in the
> ordinary course of business; (ii) AGR electronically created and sent a copy
> of each invoice to 21st Capital, along with a request that 21st Capital
> factor/purchase the invoice by advancing to AGR immediately available
> funds in an amount equal to eighty percent (80%) of the total amount of
> such invoice, all in conformance with the terms and conditions of the

---

[1] In evaluating a contempt motion, ambiguities in the record are to be resolved in favor of the party charged with contempt.  *See FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) ("These elements must be proven by clear and convincing evidence, and ambiguities must be resolved in favor of the party charged with contempt." (citation omitted) (internal quotation marks omitted)).  Thus, while the facts are largely undisputed, where we discern ambiguity we consider the facts from 21st Capital's perspective.

[2] "While at common law a factor was a selling agent and had a lien on his principal's goods in his possession for advances and commissions, the present-day factor is a financier who lends money on the security of merchandise or accounts receivable ... ."  H.H. Henry, *Necessity and Sufficiency of Notice or Statement Prescribed By Factor's Lien Law*, 96 A.L.R. 2d 727 (1964).

factoring agreement; and (iii) ultimately, as the invoices became due, Bayer approved and paid them directly to 21st Capital, as AGR's assignee. (Appellant's Opening Br. at 6.) In other words, AGR provided staffing to Bayer; 21st Capital paid AGR for that staff; and then Bayer in turn paid 21st Capital.[3]

The mechanics of the parties' factoring arrangement included 21st Capital periodically sending online Invoice Confirmation Agreements ("ICAs") to Bayer, as noted in step "(ii)" of the foregoing quotation describing the parties' dealings with one another. According to 21st Capital, Bayer was then required to acknowledge, and thereby authenticate, each and every invoice that AGR factored, and subsequently pay each invoice directly to 21st Capital. For each invoice directed to Bayer, 21st Capital claims that "a paper trail exists (in the form of a verifiable, electronic record) in which Bayer [not only] formally replied and agreed in writing to pay 21st Capital" (Appellant's Opening Br. at 7), but also agreed to waive all of its defenses to payment, pursuant to the California Commercial Code § 9403.

By June 2009 Bayer's payments had become – at least in 21st Capital's view – increasingly inconsistent and late. According to 21st Capital's records, Bayer owed it over $2 million on unpaid invoices (the "Bayer Debt"). Because of the magnitude of that sum, 21st Capital sought assurances from Bayer that Bayer's records were consistent with its own, so, for further verification, it sent Bayer an "Aging Report" on June 15, 2009, which highlighted the Bayer Debt. Although the parties disagree on the significance of Bayer's response – and whether Bayer was in fact responding to 21st

---

[3] 21st Capital never properly filed its security interest in Bayer's accounts receivable – and therefore never perfected that interest – and so is not considered a secured creditor in AGR's bankruptcy proceeding.

4

Capital's request for confirmation or to another matter altogether[4] – three days after 21st Capital sent the Aging Report, Karen Moran, Bayer's lead for "authoriz[ing] invoices," replied in an email, stating, "Hello. Sorry I havent [sic] got back to you until now. This is correct." (J.A. 861-64 (Karen Moran's Deposition), 323 (Email).) A few weeks later, on July 21, 2009, AGR suddenly and without warning announced that it was immediately ceasing operations. Unbeknownst to Bayer and 21st Capital, at the time AGR shut down,

---

[4] During her deposition, Moran denied ever responding to 21st Capital's email regarding the Bayer Debt:

Q: And you responded to Mr. Ford's email, June 15; did you not?
A. No, I don't believe I did.
Q. Do you recall approving the accuracy of the invoices in the aging report that is attached to his June 15 email?
A. I don't.
… .
Q. When you say this is correct, you're responding affirmatively to the accuracy of the aging, the invoices or all the information in the aging report attached to Mr. Ford's email, correct?
A. No, I can't be sure this answers to that.
Q. What do you think it's for?
A. I don't know.
Q. What do you think he was asking?
A. I don't know.
… .
Q. Do you recall then in what context you said this is correct in your email of June 18?
A. I can't remember what that would be for.

(J.A. at 621-625 (Karen Moran's Deposition).) The District Court noted that it did not find it necessary to resolve this factual dispute to rule on the Bankruptcy Court's finding of contempt.

a significant number of its invoices – approximately $2,000,000-worth that 21st Capital had already factored – were fraudulent.

      B.     *California Action & Stipulated Order*

On or about August 7, 2009 – after the involuntary bankruptcy petition was filed against AGR but before any relief was ordered by the Bankruptcy Court – 21st Capital filed a complaint (the "California Action") against Bayer in the Superior Court of California, County of Los Angeles, Central District, to recoup payment from Bayer for the Bayer Debt based on two "legal theories under the laws of the State of California": (1) Money Had and Received and (2) Goods and Services Sold and Delivered. (Appellant's Opening Br. at 8.) At about the same time, Bayer initiated an Adversary Proceeding in the Bankruptcy Court against AGR's Trustee and 21st Capital to resolve "possible conflicting claims concerning, *inter alia*, payments due and owing by Bayer to [AGR] on or before about July 20, 2009, for certain invoiced and uninvoiced amounts for services rendered by or on behalf of [AGR] before [AGR] ceased operations, in the approximate amount of $302,057.81 (the 'Bayer Receivable')." (J.A. at 141 (Stipulated Order at 2).) In its initial response to Bayer's motion, 21st Capital "expressly argued that the Bankruptcy Court had no jurisdiction to decide the matters at bar in the California Action." (Appellant's Opening Br. at 9.) Nonetheless, rather than fully litigate the Adversary Proceeding, 21st Capital decided to temporarily stay the California Action and enter a stipulation with Bayer and the Trustee in the Bankruptcy Court. After "at least six hearings" and discovery (Appellee's Br. at 3), the parties – 21st Capital, Bayer, and the Trustee – signed a Stipulated Order, which expressly defined the terms "Accounts

6

Receivable" and "Bayer Receivable" as follows: (1) "Accounts Receivable" are "an asset of the Debtor's estate," which includes "any amount owed with respect to services actually performed by or on behalf of the Debtor for Bayer which Bayer has not paid"; and (2) the "Bayer Receivable" is the payment "due and owing by Bayer to Debtor on or before about July 20, 2009, for certain invoiced and uninvoiced amounts for services rendered by or on behalf of Debtor before Debtor ceased operations, in the approximate amount of $302,057.81." (J.A. at 141 (Stipulated Order at 2).) The Order also stated, in part:

> WHEREAS, Bayer has averred herein that the payment of $302,057.81 into the custody of this Court represents the full and complete payment of any and all valid and owing invoices, accounts receivable or other amount due from Bayer for any and all services performed or provided by the Debtor for Bayer, and said payment fully satisfied its obligations to the Debtor regarding all services provided or performed by the Debtor for Bayer through and including the date of said payment; and ...
>
> WHEREAS, 21st Capital contends in the California Action that Bayer's alleged liability to 21st Capital is the result of alleged specific contractual agreements; and
>
> WHEREAS, notwithstanding Bayer's payment of said $302,057.81 and Bayer's contentions set forth above, 21st Capital contends in the California Action (which Bayer denies) that Bayer, as the result of alleged specific contractual agreements is independently liable to 21st Capital for the principal amount of $2,156,194.91 (the "21st Capital Claim") ...
>
> WHEREAS, the 21st Capital Claim is not an asset of the Debtor's estate.
>
> NOW, THEREFORE, it is hereby stipulated by, between and among the Parties ...
>
> 3. Within a reasonable time after this final Stipulated Order becomes nonappealable, 21st Capital shall amend its Complaint in the California Action to assert the 21st Capital Claim;

7

4. That 21st Capital shall not pursue any claim in the California Action against Bayer for the recovery of the Bayer Receivable as defined herein or the Accounts Receivable, as defined herein;

5. If it is discovered in the course of the California Action, that Bayer owes additional sums to the Debtor for services actually performed by the Debtor and/or its personnel or representatives, that is, if any Accounts Receivable actually exist, 21st Capital shall promptly notify the Trustee and at the request of Bayer or the Trustee, this Court shall enter an appropriate order as to the disposition of said assets; …

8. This Stipulated Order shall close this adversary proceeding; however, the Court shall retain jurisdiction to enforce this Stipulated Order … .

(J.A. at 141-444 (Stipulated Order at 2-5).)

In essence, the Order re-opened the door to the California Action. While the Order expressly prohibited 21st Capital from pursuing in the California Action any "Accounts Receivable" or the "Bayer Receivable" – as expressly defined in the Order – it also gave 21st Capital the green light to pursue the "21st Capital Claim," which appears to have reference to "alleged specific contractual agreements" between 21st Capital and Bayer as embodied in the ICAs. The Order also made clear that the 21st Capital Claim was not a part of the Debtor's estate. All parties have agreed that the outstanding, unpaid invoices that 21st Capital relied upon in paying AGR – outside of what Bayer has already paid to the estate in the Adversary Proceeding – were a complete fabrication.

In a purported attempt to abide by the Order, 21st Capital filed its First Amended Complaint (the "FAC") in the California Action, adding a cause of action for "Breach of Written Contract," but maintaining its two earlier causes of action for "Money Had and Received" and "Goods and Services Sold and Delivered." (J.A. at 159-61 (FAC at 4-6).) For the "Goods and Services Sold and Delivered" claim, 21st Capital amended the

8

Complaint to clarify that Bayer "became indebted to [21st Capital] in the sum of $2,156,194.81 for services *allegedly* sold and delivered by AGR," (J.A. at 161 (FAC at 6) (emphasis added)), in contrast to the original language of the Complaint that had stated Bayer "became indebted to [21st Capital] … for services sold and delivered to defendant" (J.A. at 740 (Original Complaint at 3-4)). 21st Capital considered the FAC as being consistent with the requirements of the Stipulated Order.

C.      *Motion for Contempt*

In response to the FAC, Bayer returned to the Bankruptcy Court and filed a Motion for Contempt, arguing that 21st Capital's claim in the California Action for "Goods and Services Sold and Delivered" was "a violation of the automatic stay" and of the Order. (J.A. at 137 (Bayer's Motion for Contempt at 4).) In its response, 21st Capital claimed that "Goods and Services Sold and Delivered" was a "common count[,] as permitted under the California Pleading Rules," and sought only to "recover for services *allegedly* rendered," whereas the Order only prohibits recovery for services that were "*actually* rendered." (J.A. at 252 (21st Capital's Response in Opposition to Motion for Contempt at 2) (emphasis added) (internal quotation marks omitted).)

21st Capital also argued that "the Motion [was] not ripe for judicial review and may soon be moot, since 21st Capital ha[d] filed a Motion for Leave to File a Second Amended Complaint" (the "SAC") in the California Action. (J.A. at 253 (21st Capital's Response in Opposition to Motion for Contempt at 3).) As a part of its SAC, 21st Capital not only voluntarily dismissed its claim for "Money Had and Received" as "inappropriate" but also requested that the claim regarding "Goods and Services Sold and

9

Delivered" be "repleaded as a common count for 'account stated' so that there is no dispute between the parties of what the plaintiff has intended." (J.A. at 330-31 (Declaration in Support of Motion for Leave at 3-4).) The proposed SAC, therefore, provided for only two causes of action: (1) "Breach of Written Contract" and (2) "Account Stated."[5]

Upon hearing from the parties, the Bankruptcy Court intimated that, at least on their face, 21st Capital's complaints in the California Action appeared to implicate AGR's accounts receivable because 21st Capital's relationship to Bayer was premised entirely on being paid for those receivables. At that time, Bayer made clear that it was not objecting to 21st Capital's claim of "Breach of Written Contract," but only to its proposed Account Stated claim (formerly denominated in the FAC as a claim for "Goods and Services Sold and Delivered"). Specifically, Bayer stated:

> Your Honor, I think the litigation is going forward, or it has gone forward up to this point, based on the contractual count that they have and would still have in their complaint in Count 1. That's the theory that they said they wanted to pursue. That's the theory that underlied the Stipulated Order, and we have no problem with them ... going forward on that.

(J.A. at 428.) In other words, Bayer did not believe that 21st Capital's claim for Breach of Contract in any way implicated AGR's accounts receivable. In addition, the Trustee of AGR's estate confirmed that there was no evidence of any additional receivables owed to

---

[5] It is unclear from the record whether the California Superior Court has granted 21st Capital leave to file the SAC. Because the "Money Had and Received" claim is not at issue here, and our resolution of the appeal does not hinge on the characterization of the third cause-of-action as either being for "Goods and Services Sold and Delivered" or "Account Stated," the filing status of the SAC is of no consequence to the present dispute.

the Debtor.  The Trustee further advised that 21st Capital's claims appeared to be that "someone inside Bayer ... somehow validated these invoices" so that 21st Capital "was induced to factor this money to AGR, and as a result of that," 21st Capital was harmed by "separate actions by an employee of Bayer."  (J.A. at 482.)

Nonetheless, the Bankruptcy Court found 21st Capital in contempt.  The Court reasoned that since, "to assert an 'account stated' action, there must be a previous debt in existence," that previous debt "would by necessity be based upon the services rendered by the Debtor to Bayer," which is now property of the estate.  (J.A. at 641 (Memorandum Opinion at 6).)

On appeal to the District Court, 21st Capital argued that the Bankruptcy Court had exceeded its jurisdiction by deciding matters of California state law and had abused its discretion by determining that 21st Capital was in contempt of the Stipulated Order.  The District Court rejected those contentions and affirmed the contempt order.  21st Capital then filed this timely appeal.

## II.    Discussion[6]

_____

[6] As more fully described herein, the Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(b)(1) and 1334.  The District Court had jurisdiction under 28 U.S.C. §§ 158(a)(1) and 1334.  We consider our jurisdiction well-grounded in 28 U.S.C. § 158(d), as well as under § 1291 and § 1292.  Although the parties do not challenge that the Bankruptcy Court's order functions as a "final order" such that an appeal is appropriate, 28 U.S.C. § 158(a)(1), we have an obligation to independently consider our jurisdiction.  Having done so, we conclude that the Bankruptcy Court's order is a final order, giving us jurisdiction pursuant to § 1291, and is also effectively an injunction, making our review proper under § 1292.

    With respect to whether a civil contempt finding constitutes a "final order," we note that we have "consistently considered finality in a more pragmatic and less technical way in bankruptcy cases than in other situations." *In re Amatex Corp.*, 755 F.2d 1034, 1039 (3d Cir. 1985) (citing cases).  Relevant factors have included "the impact of the matter on the assets of the bankruptcy estate, the preclusive effect of a decision on the merits, and whether the interests of judicial economy will be furthered." *F/S Airlease II, Inc. v. Simon*, 844 F.2d 99, 104 (3d Cir. 1988).  Here, the contempt finding is based on a Stipulated Order that resolved an adversary proceeding, retaining jurisdiction as to that proceeding only to enforce the Stipulated Order.  Under these facts, the bankruptcy order was final, and so too the District Court's decision to then uphold that order. *See In re Prof'l Ins. Mgmt.*, 285 F.3d 268, 281 (3d Cir. 2002) ("[A] bankruptcy court order ending a separate adversary proceeding is appealable as a final order even though that order does not conclude the entire bankruptcy case.") (internal quotation marks omitted).  While the Bankruptcy Court ostensibly leaves 21st Capital's "Breach of Contract" claim intact in its "Order of the Court," its decision is of contrary effect.  In finding that 21st Capital's "Account Stated" claim was impermissible, the Court explicitly reasoned that 21st Capital "cannot escape the tentacles of the Debtor in attempting to establish its relationship with Bayer." (J.A. at 33.)  That same reasoning applies to 21st Capital's "Breach of Contract" claim, and thus means the order effectively denies relief sought by 21st Capital on the discrete issue of whether it can pursue the California Action.

    With respect to the contempt finding constituting an injunction, it was (1) directed to 21st Capital, (2) was enforced by contempt, and (3) was designed to give substantive relief to Bayer.  It thus meets all of the criteria we have set forth for determining that an order has the practical effect of an injunction. *Cohen v. Bd. of Trs. Of the Univ. of Med. & Dentistry of N.J.*, 867 F.2d 1455, 1465 n.9 (3d Cir. 1989).  Accordingly, it is appealable under § 1292. *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 110 (3d Cir. 2004).

21st Capital seeks to recoup from Bayer more than $2,000,000 that it paid AGR as a result of AGR's fraudulent invoices, but Bayer asserts that 21st Capital is effectively trying to recover AGR's outstanding receivables from Bayer, in violation of the Stipulated Order. The problem with Bayer's argument is that "Accounts Receivable" is a defined term in the Order. If the invoices are indeed fraudulent, as Bayer itself insists they are, then those invoices do not represent services actually rendered by AGR to Bayer. That places the sums stated in the invoices outside of the defined category of "Accounts Receivables," which 21st Capital is prohibited to pursue. Fundamentally, Bayer – along with the Bankruptcy Court and the District Court – has confused the defined term "Accounts Receivable" with whatever debt Bayer may owe 21st Capital due to AGR billing.

Of the several issues on appeal, we need only address the question of the Bankruptcy Court's jurisdiction and whether the contempt order was an abuse of that Court's discretion.

---

When reviewing a district court appeal of a bankruptcy court decision, we exercise the same standard of review as the district court. *Manus Corp. v. NRG Energy, Inc.*,188 F.3d 116, 122 (3d Cir. 1999). We review de novo a bankruptcy court's legal determinations, including whether it properly exercised its subject matter jurisdiction. *In re RFE Indus., Inc.*, 283 F.3d 159, 163 (3d Cir. 2002). However, when reviewing a district court's decision on a motion for contempt, we apply an abuse of discretion standard. "Reversal is appropriate 'only where the denial is based on an error of law or a finding of fact that is clearly erroneous.'" *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d Cir. 1995) (quoting *Harley-Davidson, Inc. v. Morris,* 19 F.3d 142, 145 (3d Cir. 1994)).

13

## A.	The Bankruptcy Court's Jurisdiction

"There are [] three types of bankruptcy jurisdiction, commonly called 'arising under,' 'arising in,' and 'related to' jurisdiction." *In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009). The first two categories cover so-called "core proceedings," in which a bankruptcy court is statutorily permitted to enter final judgments, whereas in a "related-to," or non-core proceeding, a bankruptcy court may only "submit proposed findings of fact and conclusions of law to the district court[.]" 28 U.S.C. § 157(c)(1). "It is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core proceedings." *In re Point Blank Solutions Inc.*, 449 B.R. 446, 449 (Bankr. D. Del. 2011). Similarly, a "determination of what is property of the estate and concurrently, of what is available for distribution to creditors of that estate, is precisely the type of proceeding over which the bankruptcy court has exclusive jurisdiction." *In re Reliance Grp. Holdings, Inc.*, 273 B.R. 374, 395 (Bankr. E.D. Pa. 2002). As for continuing jurisdiction over a stipulated agreement, such as the Order at issue here, while a "court does not have continuing jurisdiction over disputes about its orders merely because it had jurisdiction over the original dispute, a stipulated agreement signed by the court does allow" for the continuing exercise of jurisdiction. *Washington Hosp. v. White*, 889 F.2d 1294, 1298-99 (3d Cir. 1989).

Despite 21st Capital's protestations, it is clear that the Bankruptcy Court had jurisdiction. This is a case centered around the question of "what constitutes property of the bankruptcy estate," and is therefore a core proceeding. *Point Blank Solutions*, 449

14

B.R. at 449. But even assuming for the sake of argument that, as 21st Capital contends, this dispute is "non-core," it is at the very least "related to" the AGR Bankruptcy proceeding. *See Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006) ("[A] proceeding is 'related to' a bankruptcy case if 'the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"). Moreover, by signing the Order, the parties consented to proceed in the Bankruptcy Court. 21st Capital thus affirmatively waived any objection to the Bankruptcy Court's exercise of jurisdiction to enforce the Order. (*See* J.A. at 144 (Stipulated Order at 5) (noting that the "the Court shall retain jurisdiction to enforce this Stipulated Order").) In fact, 21st Capital admits as much, stating that it "does not dispute that the Bankruptcy Court had proper jurisdiction over the [Adversary Proceeding] or that it could decide whether 21st Capital was in contempt." (Appellee's Br. at 29 (citing Appellant's Opening Br. at 21 n.6).) Having agreed to submit itself to the Bankruptcy Court's jurisdiction to enter the Stipulated Order, 21st Capital cannot opt out of proceedings to enforce the Order now. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 138 (2009) ("The Bankruptcy Court plainly ha[s] jurisdiction to interpret and enforce its own prior orders, and it explicitly retained jurisdiction to enforce its injunctions when it issued the [earlier] Orders." (citation omitted)).

### B. Contempt Order

"Proof of contempt requires a movant to demonstrate '(1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order.'" *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d

15

Cir. 2010) (citations omitted). Each element must be proven by clear and convincing evidence, with ambiguities resolved in favor of the party charged with contempt. *Id.* "Although courts should hesitate to adjudge a defendant in contempt when 'there is ground to doubt the wrongfulness of the conduct,' an alleged contemnor's behavior need not be willful in order to contravene the applicable decree. In other words, 'good faith is not a defense to civil contempt.'" *Id.* (citations omitted).

The Bankruptcy Court and District Court focused their detailed analyses on whether an "Account Stated" cause of action would touch any of AGR's accounts receivable and whether 21st Capital's UCC defenses were appropriate. As noted above, the Account Stated claim plainly involves fraudulent invoices which by definition cannot constitute accounts receivable. In addition, the courts looked beyond the mark. The Stipulated Order should have been the starting point for the analysis. Here, although the parties did not present the Bankruptcy Court with a stipulation as clear as it could have and should have been, the Stipulated Order nonetheless established that 21st Capital could proceed with the California Action.

We agree with 21st Capital that, "[f]ar from disobeying a valid court order," it "did exactly what the [s]tipulation provided: It amended its complaint in the California Action and pursued the 21st Capital Claim in state court." (Appellant's Opening Br. at 28.) Bayer seems to think that, if there are no legitimately due invoices from AGR, then 21st Capital is precluded from pursuing any cause of action against Bayer that at all relies on 21st Capital's relationship with Bayer via its relationship with AGR. If that were the case, however, 21st Capital "would not have bothered negotiating the narrow definition

16

of 'Accounts Receivable.'" (Appellant's Reply Br. at 19.) More to the point, if 21st Capital had no claim to any damages from Bayer, the Stipulated Order would not have provided express guidance to 21st Capital in resuming the California Action, nor would it have defined the 21st Capital Claim as being separate from the Debtor's estate. The Order only precludes 21st Capital from pursuing AGR's "Accounts Receivable," as that term is defined within the Stipulated Order. The parties even provided a mechanism under which Bayer is to notify the Court if any additional Accounts Receivable are "discovered in the course of the California Action." (J.A. at 143.)

On this record, it was an abuse of discretion to hold 21st Capital in contempt and prevent it from moving forward in the California Action.[7]

## III. Conclusion

21st Capital abided by the Order; it did not flout it. We will therefore reverse the District Court order affirming the Bankruptcy Court and remand to the District Court to reverse the contempt order entered by the Bankruptcy Court.

---

[7] None of this is to say that a finding of contempt may not later prove warranted. If, for example, 21st Capital still proffers the same jury instructions as it provided under its "Goods and Services Rendered" claim, 21st Capital may well be in violation of the Stipulated Order. 21st Capital cannot claim that it abides by the Stipulated Order if, in its proposed jury instructions, it sets out to prove that "AGR provided the services" to Bayer and that "reasonable value of the services [] were provided." (J.A. at 408 (Reply to 21st Capital's Response in Opposition to Bayer's Motion for Contempt, App'x A).)