Thomas P. Agresti, Judge
This matter concerns an Order to Show Cause ("OTSC") that was issued in both of the above cases against Ocwen Loan Servicing, LLC ("Ocwen") and three individuals regarding a failure to comply with a number of Court orders requiring the production of complete mortgage loan histories in several bankruptcy cases. For reasons that will be discussed in detail below, the Court finds that Ocwen materially disobeyed a number of valid orders and is liable in civil contempt to pay compensatory *794 damages in an amount still to be determined, though it will be "capped" at a maximum of $ 70,000. There is a lengthy procedural history to this matter which must be understood to fully grasp the situation presented, and the Court therefore begins with a review of that history.
PROCEDURAL BACKGROUND
The present matter ultimately stems from a seemingly routine hearing that was held some 22 months ago, on May 24, 2017.[1] Approximately one year prior to that, and pursuant to Fed.R.Bankr.P. 3002.1(c) , Ocwen had filed Notices of Postpetition Mortgage Fees, Expenses, and Charges ("Notices") in both the Randolph and Ransom cases seeking $ 400 in attorney fees in each, allegedly incurred by Ocwen in connection with the bankruptcies of those Debtors. In mid-March 2017, the Trustee filed Objections to those Notices,[2] raising a number of issues, including that the attorney fees being sought by Ocwen were for the services of a law firm - Robertson, Anschutz & Schneid, P.L. ("RAS") - that was not licensed to practice law in Pennsylvania. Ocwen filed a response to the Objections in which it indicated that the Notices with the RAS fees had been filed as a result of a "technical error." A day prior to the scheduled hearing on the Objections, the Trustee and Ocwen filed a proposed consent order indicating that they had reached a resolution of the matter pursuant to which Ocwen agreed to waive the fees and provide the Trustee with proof that any reference to the fees had been removed from the accounts of these Debtors.
At the May 24th hearing the Court indicated that it was not prepared to sign the consent order until a significant concern was first addressed. Specifically, the Court inquired as to whether these two cases were just isolated instances in which improper RAS fees had been charged by Ocwen, or whether the same thing had been done in other cases that had perhaps slipped through the system undetected and unchallenged. When neither the Trustee nor Ocwen could provide any information to answer that question, the Court decided to schedule an evidentiary hearing to explore the matter further. An Order was issued on May 31, 2017 scheduling an evidentiary hearing at which representatives of Ocwen and RAS were directed to appear and respond to a number of questions that were listed in the Order.
On July 17, 2017, a week before the evidentiary hearing,[3] the Trustee filed Trustee's Supplemental Report for the Court. See Ransom Doc No. 60, Randolph Doc No. 139. This Report stated that the Trustee had reviewed her records and found a total of 30 cases in which Ocwen had filed Notices seeking attorney fees for similar legal work done by RAS. The Court's concern that the problem was more extensive than just the Randolph and Ransom cases was thus realized. The Trustee's July 17thReport , further stated that the Trustee had filed objections to the Notices in a number of those cases (including *795 Ransom and Randolph ) and had actually obtained default orders in some of them. Accompanying this Memorandum Opinion at Appendix "B" is a list of cases identified in the Trustee's Report referred to hereinafter as "the Affected Cases"[4] for purposes of this Opinion.[5] Appendix "B" also identifies the subset of Affected Cases in which default orders had been entered on objections by the Trustee.
At the July 24, 2017 evidentiary hearing, Attorney Steven Eisenberg, outside counsel for Ocwen ("Eisenberg"), began by stating that RAS had done administrative work for Ocwen from June 2015 through June 2016, but RAS was no longer doing such work for Ocwen, and therefore no further Notices for RAS work would be filed in this District. He also reported that the Notices in the Affected Cases had been filed due to a "manual mistake"[6] explaining that RAS was supposed to indicate on each billing invoice it submitted to Ocwen for a particular loan whether the legal work done by RAS was "recoverable" or not, depending on the jurisdiction where the bankruptcy case was pending. Eisenberg indicated that in the invoices for the Affected Cases, RAS had mistakenly indicated the charges were in fact recoverable in these matters, which mistake was not detected by Ocwen prior to the filing of the Notices.
The Court inquired of Eisenberg whether, as of then, Ocwen had turned over loan histories of the Affected Cases to the Trustee, something that was part of the proposed "settlement" that had been presented at the May 24th hearing. Eisenberg represented that the loan histories had not yet been provided but completion of this task was "in process."[7] The Court expressed some surprise about that failure on Ocwen's part, and in a colloquy with James Broome ("Broome"), the "Team Lead" in Ocwen's Legal Department of the Bankruptcy Contested Group, stressed in blunt language how important it was that Ocwen quickly supply the Trustee with loan histories. Indeed, the Court went so far as to preemptively state that if the loan histories were not timely provided there would be sanctions imposed.[8] This is an appropriate place to make a brief detour for the purpose of setting forth what the *796 Court's understanding at that point in time was regarding the meaning of a "loan history" because, as will soon become apparent, that is one of the major issues raised by the OTSC.
Stated plainly, the Court was operating from the premise that, unless otherwise qualified by an additional limiting term such as "partial" or "post-petition," a loan history meant a record of the loan from the date of its inception up to the present. That was consistent with the language in the various default orders directed against Ocwen that had previously been issued by the Undersigned and other members of the Court in some of the other Affected Cases. See Appendix "B," cases underlined and with double asterisks. Those default orders provided that Ocwen was to provide "full and comprehensible loan histories from the inception of the loan." See, e.g., Shreffler , Case No. 15-10722-TPA at Doc. No. 57, issued May 30, 3017. Indeed, the proposed order that accompanied the Trustee's Objections to the Notices in Ransom and Randolph included that same language. See, Ransom Doc No. 43, Ransom Doc. No. 123. The expanded phrase "complete loan history" could only reinforce the comprehensive nature of what was required. The Court now turns back to the main flow of the discussion.
Following the July 24th hearing the Court issued an Order ("July 26th Order"[9] ) which formally brought all of the Affected Cases under this proceeding for purposes of addressing the Notices filed by Ocwen and related matters. The July 26th Order also provided that on or before August 4, 2017, and with respect to each of the Affected Cases, Ocwen was to
"(a) file Affidavits in the respective cases attesting that any legal fees related to plan review by RAS have been removed from the Debtors' accounts and will not be further pursued, and (b) provide a complete loan history to the Trustee."
See Ransom Doc. No. 64 and Randolph Doc. No. 148. The July 26th Order further directed the Trustee to file a notice on or before August 11, 2017, indicating whether she was or was not satisfied that Ocwen had complied with its obligations under the Order. If Ocwen complied, any pending motion for sanctions filed by the Trustee in any of the Affected Cases would be deemed withdrawn and the matter would be concluded. The July 26th Order therefore formally expanded the scope of this proceeding from just the Ransom and Randolph matters to all of the Affected Cases and brought Ocwen's compliance with Orders related to Notices issued in all of those cases under the same umbrella. That was done largely as a matter of administrative convenience, so the Court would not have to deal with essentially the same issues in 30 "plus" separate cases.
Ocwen filed Affidavits in all of the Affected Cases on August 4, 2017. Those Affidavits, which were of the same general form in each instance, were signed by Broome and recited that Ocwen's records had been adjusted to remove the attorney fees sought in the corresponding Notice. According to the body of the Affidavit, allegedly attached to each of the Affidavits was a "complete and accurate post-petition loan payment history." Also filed on that same date in certain of the Affected Cases by Ocwen was a separate document identified as an "Ocwen Pre-Petition History."
*797 On August 11, 2017, the Trustee filed her Trustee's Report Concerning Ocwen's Response and Motion to Compel and for Additional Sanctions . See Ransom Doc. No. 73, Randolph Doc. No. 161. In that document the Trustee reported that - contrary to Ocwen's representations in the Affidavit - as to the Affected Cases, Ocwen had failed to provide a "complete loan history," a term which she correctly understood to mean a document reflecting "all money owed and all payments made from the inception of the loan to the present," not just during the post-petition period.[10] The Trustee further indicated that she had "repeatedly" made that position clear to Ocwen's attorney following the issuance of the July 26th Order. As clearly stated in its Orders and at prior hearings regarding this point, the Trustee's interpretation of the language used by the Court concerning the extent and time frame to be covered in the loan payment histories was correct and consistent with the Court's intent.
Needless to say, the Court was disappointed after reviewing the Trustee's August 11thReport , having come away from the July 24th hearing with some optimism that matters involving the Notices would soon be resolved. The Court reacted by quickly issuing an Order dated August 14, 2017 stating that, while it was not prejudging the matter, if the Trustee's allegations of non-compliance proved to be true, Ocwen would be expected to provide a compelling excuse for not complying with the Court's order or face "considerable monetary sanctions" for its failure to do so. Ocwen was directed to file a response by August 21, 2017, and a hearing was scheduled for August 31, 2017.
Ocwen filed its response to the Trustee's August 11thReport on August 21, 2018. In that response Ocwen acknowledged that it had not provided complete loan histories, as defined by the Trustee, but then went on to argue that the Trustee's definition was over broad and unnecessary. For example, Paragraph 118 of the Ocwen response, in part, states:
Respondent respectfully disagrees with the Trustee's definition of a "complete loan history." The term "complete loan history" must be taken in the context of the proceeding currently before the Court, an Objection to PPFN, which are by definition only addressing fees, costs and expenses after the filing of the Bankruptcy. At paragraph
8 of the report, the Trustee quotes the Webster's dictionary definition of the word "complete." Notably, the Trustee elected to highlight and focus upon the alternative definition listed at section "4a" of the definition. Respondent asserts that the (standard) first definition, listed at section "1a" is more appropriate and applicable in the current context. According to the standard Webster's definition, "complete" means "having all necessary parts, elements, or steps."
Ransom Doc. No. 78 and Randolph Doc. No. 167 at ¶ 78. Ocwen argued that, given the "context" of the July 26th Order, the limited postpetition history it had provided to the Trustee met this alternative definition of "complete."
At the August 31st hearing the Court informed Ocwen's attorney that (a) the July 26th Order represented a directive of the Court itself - not the Trustee - for the turnover of information, and (b) the *798 Court's intent in requiring complete loan histories to be provided corresponded with the definition of "complete" as advanced by the Trustee in her August 11thReport , and not with Ocwen's proposed, unduly narrow definition. The Court also stated that it believed the July 26th Order was clear in that regard and did not leave any room for a "creative interpretation" by Ocwen. Ocwen's attorney responded to the effect that the Court's meaning was now "crystal clear." Despite Ocwen's acknowledged failure up to that point to have complied with the July 26th Order given the clear meaning of "complete loan histories," the Court indicated that before imposing any sanctions it was going to give Ocwen one last opportunity for a "reprieve" if Ocwen fully complied with the Court's prior directive within 30 days. Ocwen's attorney stated that the 30th day appeared to fall on a religious holiday, so the Court stated it would extend the period to 45 days.
The Court's grant of a "reprieve" to Ocwen was embodied in an Order that was entered following the hearing ("September 1st Order"[11] ). See Ransom Doc. No. 85 and Randolph Doc. No. 172. The September 1st Order required Ocwen to provide the complete loan histories by October 13, 2017 and the Trustee was to report back to the Court by that same date as to whether she believed Ocwen had complied. The Trustee was also directed to file another report with the Court by December 1, 2017 setting forth the results of her substantive review of the materials provided and giving her opinion as to whether the materials revealed any issues that should be brought to the Court's attention.
On October 13, 2017, the Trustee's Report Concerning Ocwen's Compliance with September 1, 2017 Order of Court was filed by the Trustee. See Ransom at Doc. No. 89 and Randolph at Doc. No. 175. The Trustee's October 13thReport indicated that Ocwen did not even begin electronically transmitting loan histories to the Trustee until October 12th, which transmissions then continued into October 13th. This news was in itself somewhat disappointing to the Court since it had assumed Ocwen would be acting in good faith to provide the loan histories on an ongoing basis as soon as it could, and not wait until the last available moment to send them all. In any event, the "eleventh hour" transmission by Ocwen to the Trustee would appear to have precluded her from making any kind of detailed analysis of the transmitted materials before the stated deadline. Nevertheless, and much to her credit, the Trustee was able to put together her October 13thReport by the deadline the Court had given. That Report indicated the Trustee believed that she had been provided with "complete loan histories" in only five (5) of the Affected Cases. Ocwen filed a response to the Report on October 18, 2018, which challenged the Report in several fairly minor respects and indicated Ocwen was engaged in an ongoing review with the Trustee concerning the loan payment histories that had been provided. As a result, Ocwen asked the Court to allow the Parties to engage in further discussions during October and November 2017.[12]
*799 The Court took no further action of any kind at that time, instead opting to wait for the filing of the Trustee's next report that was due by December 1st pursuant to the September 1st Order. However, on November 28, 2017, the Trustee filed a motion seeking to extend the deadline for filing that report to February 1, 2018. Fearing that the process had gotten completely off track, on December 21, 2017, the Court issued the OTSC which is the subject of this Memorandum Opinion and Order . See Ransom Doc. No. 94, Randolph Doc. No. 180.[13] The OTSC directed several named individuals and a representative of Ocwen to appear and show cause why they should not be sanctioned for violating the July 26th and September 1st Orders with respect to Ransom, Randolph and the other Affected Cases. The OTSC hearing was scheduled for January 24, 2018 but later rescheduled to January 30th. The Trustee's motion to extend the deadline for filing her report was scheduled for hearing at the same time.
The January 30th OTSC hearing was never held because Ocwen filed a notice of appeal on January 4, 2018, indicating it was appealing not only the OTSC, but the July 26th and September 1st Orders as well.[14] Ocwen's appeal had the effect of freezing any further action on the OTSC until the appeal was resolved. On March 2, 2018, the District Court issued an opinion and order dismissing the appeal and remanding the matter to this Court.[15] In so doing, the District Court held that Ocwen's notice of appeal was untimely as to the July 26th and September 1st Orders, that the OTSC was not a final order for appeal purposes, and that Ocwen had failed to show grounds which would allow it to take an interlocutory appeal of the OTSC. Even then, however, the appeal did not end because on March 29, 2018, Ocwen filed a motion seeking leave to file an "out of time motion" for reconsideration in the District Court. On May 15, 2018, that motion was denied thus finally allowing the previously pending OTSC procedure to resume in this Court. See Ransom Doc Nos. 136 and 137, and, Randolph Doc Nos. 226 and 227.
On May 17, 2018, this Court scheduled a new hearing on the OTSC for June 20, *800 2018. Ocwen filed a response to the OTSC on June 13, 2018, and on June 15, 2018, and June 19, 2018, respectively, the Trustee filed an updated Report and an amended, updated Report to supplement what she had previously filed. An extensive day-long evidentiary hearing on the OTSC was thereafter held on June 20, 2018, which hearing was continued to July 31, 2018, encompassing a further day-long hearing. After filing of post-trial briefs, preparation and filing of the extensive hearing transcript, the recent filing of proposed findings of fact and conclusions of law, as well as the recent conclusion of final arguments, the record is now closed and the matter is ripe for decision.
JURISDICTION
The Court typically addresses jurisdiction in a footnote, or in a sentence or two in the main Discussion. However, since the issue of jurisdiction is a bit more involved here the subject requires more attention.
As a general matter, the Court finds that the OTSC represents a core matter over which it has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 1334 . Beyond this general finding, the Court notes that, in its ill-fated appeal to the District Court, Ocwen questioned whether this Court had the jurisdiction to enter the OTSC in Randolph (but not Ransom ), because an order had been entered in the case on August 8, 2017, dismissing that case based on a motion by that Debtor to voluntarily dismiss. See Randolph Doc. Nos. 143 and 158. The District Court rejected that argument, noting that the July 26th Order pre-dated the dismissal order in Randolph , and that subsequent orders related thereto, including the OTSC, were efforts to enforce and vindicate the July 26th Order. As such, the District Court expressed the view that the OTSC was likely within this Court's ancillary jurisdiction. See District Court's Memorandum Opinion at 6-8, citing, inter alia, Iannini v. Winnecour , 487 B.R. 434 (W.D. Pa. 2012). The actual basis for the District Court's decision to dismiss the appeal, however, appears to have been lack of finality, so its comments about jurisdiction were arguably dicta. Ocwen has not raised any jurisdictional challenge on this remand, but in light of what occurred on the appeal, the Court will nevertheless consider whether it had jurisdiction to enter the OTSC in Randolph .
In Cooter & Gell v. Hartmarx Corporation , 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) the court held that a district court retained jurisdiction to impose sanctions under Fed.R.Civ.P. 11 for conduct occurring during litigation even after the litigation had been voluntarily dismissed by the plaintiff. The court based its decision on the "well established" principle that a federal court may consider collateral matters after an action is no longer pending, and cited numerous examples, including:
A court may make an adjudication of contempt and impose a contempt sanction even after the action in which the contempt arose has been terminated. See United States v. Mine Workers , 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947) ("Violations of an order are punishable as criminal contempt even though ... the basic action has become moot"); Gompers v. Buck's Stove & Range Co., supra , 221 U.S. [418] at 451, 31 S.Ct. [492] at 502 [55 L.Ed. 797] (when main case was settled, action became moot, "of course without prejudice to the power and right of the court to punish for contempt by proper proceedings").
496 U.S. at 396, 110 S.Ct. 2447. See also In re Bath and Kitchen Fixtures Antitrust Litigation , 535 F.3d 161, 166 (3d Cir. 2008)
*801 ("A district court retains jurisdiction to decide collateral issues - such as sanctions, costs, and attorney fees - after a plaintiff dismisses an action by notice").
This post-dismissal power over collateral matters is found under the rubric of "ancillary jurisdiction," which exists in part to "enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen v. Guardian Life Ins. Co. of America , 511 U.S. 375, 380, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Ancillary jurisdiction of this type applies in bankruptcy courts as well. In addition to the Iannini case cited by the District Court, see also In re Birting Fisheries, Inc. , 300 B.R. 489, 499 (9th Cir. BAP 2003) (a bankruptcy court's original core jurisdiction continues so that it can enforce its orders even after a case has been closed); In re Kitchin , 327 B.R. 337, 359 (Bankr. N.D. Ill. 2005) (bankruptcy court retains jurisdiction after dismissal of case to consider sanctions under Rule 11 or any other authority); In re Henderson , 360 B.R. 477 (Bankr. D. S.C. 2006) (court had jurisdiction to issue rule to show cause even after case was closed); In re Wilson , 413 B.R. 330 (Bankr. E.D. La. 2009) (dismissal of matter does not deprive court of power to award sanctions because that is a collateral matter and the court has an interest in protecting the integrity of the judicial system against improper conduct).
The above authority persuades the Court that it had jurisdiction to issue and consider the OTSC in both Ransom and Randolph . The original matter concerning the Notices filed by Ocwen was within the Court's jurisdiction as a core matter pursuant to 28U.S.C. §§ 157(b)(2)(A) and 1334. The OTSC was issued in furtherance of the enforcement of prior orders issued as part of that core jurisdiction. See, e.g., In re White-Robinson , 777 F.3d 792 (5th Cir. 2015) (holding a party in civil contempt for refusing to follow a bankruptcy court's order that was issued as part of the bankruptcy case is itself a core proceeding). The fact that the Randolph case had been dismissed prior to the issuance of the OTSC does not change that conclusion, particularly since the process that culminated in the OTSC had been initiated by the July 26th Order, before the case had been dismissed. The Court further notes that its conclusion here is not only supported by abundant authority, but also appears to be sound policy. To hold otherwise would invite abuse by allowing parties to manipulate the system and escape the consequences of improper behavior by arranging for the dismissal of a case before a sanctions proceeding could be heard.[16]
Finally, the Court also notes that while the Debtor's motion to dismiss in Randolph was granted, the case itself has never been closed. In the context of Chapter 13, it is not unusual for a dismissed case to nevertheless go forward in existence indefinitely to allow for the completion of various administrative matters, such as the completion and filing of the Trustee's Final Accounting and related documents. In short, there is a distinction between a "dismissed case" and an actual closure of a case and the latter has not yet occurred in Randolph . The issue of jurisdiction as to Randolph is something of a red herring anyway since the same orders upon which *802 the OTSC was based were also issued in Ransom , wherein the Court's jurisdiction is undisputed, and although the issue was never raised as to the Affected Cases in which default orders were entered, those cases were open as well when the Orders were entered and most remain open even now.
DISCUSSION
Although it may sometimes be difficult to see, given the dense thicket of facts generated by the 31 separate cases that make up the Affected Cases herein, the issues presented in the OTSC are relatively simple and straightforward. First, did Ocwen fail to comply with the requirements of the July 26th Order, the September 1st Order, or any of the default orders issued in the Affected Cases such as to warrant a finding of civil contempt[17] and the imposition of a sanction by the Court? Second, if so, what is an appropriate sanction? Before turning to a review of those issues, it is helpful to briefly review the law concerning a bankruptcy court's power to impose civil contempt sanctions for the violation of its orders.
It is well-recognized that both 11 U.S.C. § 105(a) and a court's inherent power to sanction provide bankruptcy courts with the power to impose civil contempt sanctions. See, In re Miller, 730 F.3d 198, 206 (3d Cir. 2013). Proof of civil contempt requires demonstration, by clear and convincing evidence with respect to each element, that (1) a valid order of court existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order. In re AGR Premier Consulting, Inc. , 550 Fed. Appx. 115, 122 (3d Cir. 2014). Any ambiguities should be resolved in favor of the party charged with contempt. Id. While courts should hesitate to adjudge a party in contempt when there is reason to doubt the wrongfulness of the conduct, the party's behavior in violating the order need not be willful. Id. Thus, a party's disobedience of a valid court order need not be "intentional" in order to support a finding of contempt. See, e.g., Harley-Davidson, Inc. v. Morris, 19 F.3d 142, 148-49 (3d Cir. 1994) (willfulness is not a necessary element of civil contempt; intent and wilfulness is relevant only as it pertains to the extent of the sanction imposed). In other words "good faith is not a defense to civil contempt." AGR Premier , 550 Fed. Appx. at 123 (quoting FTC v. Lane Labs-USA, Inc. , 624 F.3d 575 (3d Cir. 2010) ). Upon a finding of civil contempt a bankruptcy court has the power to issue sanctions such as costs, compensatory damages, and attorney fees. In re Brown , 481 B.R. 351, 363 (Bankr. W.D. Pa. 2012).
(A) Existence of a Valid Order
The validity of the July 26th and September 1st Orders that were issued in Ransom/Randolph was never questioned in *803 any way by Ocwen until it filed the notice of appeal on January 4, 2018. Ocwen never filed a motion for reconsideration of either order and it has never filed a motion seeking relief from either of the Orders on any of the grounds available under Fed.R.Bankr.P. 9024. As to the appeal, the District Court has held that by the time the notice of appeal was filed it was too late to appeal those two Orders.
The same basic analysis holds true with respect to the default orders that were entered in some of the other Affected Cases. Those orders were issued only after Ocwen failed to respond to objections which the Trustee had filed in the cases in question despite having been given the opportunity to do so. Those objections by the Trustee were filed pursuant to Fed.R.Bankr.P. 3002.1(e) , which specifically contemplates the Court ruling on such objection.[18] No evidence has been presented that the validity of those orders was ever questioned by Ocwen.
The Court thus finds that the first element for a finding of civil contempt, the existence of a valid order, has been established by clear and convincing evidence with respect to the July 26th Order, the September 1st Order, and the various default orders in the other Affected Cases.
(B) Ocwen's Knowledge of the Orders
There is likewise no dispute as to this next element, at least with respect to the July 26th and September 1st Orders entered in Randolph/Ransom . Both orders were issued following hearings at which Ocwen was represented by counsel who was present at the hearing. At the hearing preceding the issuance of the July 26th Order, an actual Ocwen employee, James Broome, was also present. The Court indicated orally at both hearings the content of the written order it planned to issue, and the orders were issued shortly thereafter and served on Ocwen's attorney. Ocwen has never contended it did not have knowledge of either of these orders.
The situation concerning Ocwen's knowledge is more complex with regard to the default orders that were issued in a subset of the Affected Cases, and that issue consumed a sizeable portion of the July 31, 2018 continued evidentiary hearing. More specifically, because in some of those default order cases no attorney had entered an appearance for Ocwen prior to the filing of the Trustee's objection, and in others there was an attorney involved but the attorney allegedly did not inform Ocwen about the default order, Ocwen takes the position that it did not have knowledge of all the default orders due to lack of notice, and that such lack of notice should serve as a "mitigating" factor. The Trustee on the other hand argues that Ocwen did have knowledge of all the default orders. As such, this issue requires further discussion. Before turning to a closer examination of the 13 default order cases that are in dispute as to the question of Ocwen's knowledge, it will be helpful to pause and review the legal standard to be applied.
A party cannot be held in contempt of an order of which it had no knowledge. In re McCullough , 63 B.R. 97, 99 (Bankr. E.D. Pa. 1986). "For the knowledge requirement to be satisfied, the violating party must possess 'actual knowledge' of the court order." In re Franks , 363 B.R. 839, 843 (Bankr. N.D. Ohio 2006) (citations omitted). As long as the party has actual knowledge it is not necessary for the party to have been served with or formally notified of the order in question. See e.g., Fid. Mortg. Inv'rs v. Camelia Builders, Inc. , 550 F.2d 47, 52 (2d Cir. 1976) (a person is in contempt of court if *804 he knowingly violates a court order, whether or not he received a formal notice; the cases do not require the contemnors to have received formal notice if they have actual knowledge of the order, citing In re Rubin , 378 F.2d 104 (3d Cir. 1967) ); Irving Tr. Co v. Spruce Apartments , 44 F.2d 218, 220 (E.D. Pa. 1930) (the rule is well settled that, if a person has actual knowledge of the existence of an order or decree of court, he is liable for the consequences of violating it, even if he has not been formally served with it); Thompson v. Johnson , 410 F.Supp. 633, 640 (E.D. Pa. 1976), aff'd, 556 F.2d 568 (3d Cir. 1977) (it is not necessary that the party be formally served with the order).
To begin with, as can be seen from Appendix "B," there are 13 cases among the Affected Cases in which a default order was entered. Of those 13 cases, Ocwen concedes that it did actually receive copies of the default orders issued in the Ranko , Makin and Shreffler cases. The Court thus finds that in light of Ocwen's admission, the second element - knowledge of the orders - has been met by clear and convincing evidence as to those three default orders from the time of their issuance.
In three other of the Affected Cases, Ocwen acknowledges having at least some notice of the default orders, not based on receipt of a copy of the orders themselves, but rather because after the default orders were entered the Trustee filed a motion to compel compliance with the default order and Ocwen had actual knowledge of those motions. The three cases in that category are Taper , Battaglia , and Zumpano .[19] Applying the applicable standard, the Court has little difficulty finding that the knowledge element was met with respect to the default orders entered in Taper , Battaglia , and Zumpano by no later than early July 2017 based on Ocwen's admitted knowledge of the motions to compel filed by the Trustee in those cases.[20] Assuming for the moment that Ocwen did not have actual knowledge of the default orders in those three cases prior to the filing of the motions to compel, they certainly had actual knowledge of them once the motions to compel were filed and served on them because the motions explicitly refer to the existence of such orders and request that they be enforced.[21] Once it received those motions to compel Ocwen had actual knowledge that the default orders had been issued, and further knew that it had unfulfilled obligations under those orders.
In seven cases Ocwen denies having any notice of the default orders until being made aware of them as part of the Ransom/Randolph proceeding. Those cases are McAteer , Powers , Gedda , Baumgartner , Goldsby , Hedlund , and Conway . As to the first five of those cases, Ocwen appears to acknowledge being informed of the entry of those default orders by Attorney Eisenberg after having received the Trustee's July 17, 2017 Report. Ransom Doc. No. 60 and Randolph Doc. No. 139. As such, notice would be clear as of then since that Report makes specific reference to the default orders in those five cases.[22] Thus, *805 as to McAteer , Powers , Gedda , Baumgartner , and Goldsby , the Court finds that Ocwen had actual knowledge of the default orders by no later than July 17, 2017. With regard to the final two cases, Hedlund was identified in the Trustee's August 11, 2017 Report and Conway was identified in the Trustee's October 13, 2017 Report. See, Ransom Doc. No. 73 and Randolph Doc. No. 162, Ransom Doc. No. 89 and Randolph Doc. No. 175. Those filing dates establish the latest possible dates of actual knowledge by Ocwen as to those two default orders.
Now that the latest possible dates of actual knowledge have been established for the ten default orders in dispute, the Court must consider whether Ocwen should be found to have had actual knowledge of those orders any earlier than those dates by virtue of the knowledge of its attorneys or otherwise. The information concerning notice of those default orders can also be gleaned from docket entries in the respective cases as summarized in the attached Appendix "C."
It can be seen that in seven of the ten cases an attorney entered an appearance on behalf of Ocwen for some purpose prior to the entry of the default order and that attorney was served with a copy of the default order, by U.S. mail from the Bankruptcy Notification Center ("BNC") and/or by e-mail through the Court's CM/ECF electronic mail. Those cases are Taper , Battaglia , McAteer , Powers , Gedda , Zumpano , and Baumgartner . In the remaining three cases no attorney had entered an appearance on behalf of Ocwen prior to the issuance of the default order, and thus no attorney was served with a copy of the default order, whether by U.S. mail, or e-mail. Those cases are Goldsby , Hedlund , and Conway . It should be noted, however, that in Goldsby the docket does show that a copy of the default order was sent by U.S. mail to Ocwen's in-house bankruptcy department in West Palm Beach, Florida by the BNC.
At the extended evidentiary hearing, Ocwen presented testimony from Broome to show that he conducted an "in-house" search of relevant records and determined that in none of the seven disputed cases where an attorney had entered an appearance on behalf of Ocwen prior to the entry of its default order did the attorney ultimately notify Ocwen about the default order, or at least he could not find anything in its records to support such a finding. Ocwen thus contends it had no knowledge of the default orders - at least prior to the July 17, 2017 "outside date" noted above - and that such "lack of notice" should be recognized for purposes of determining whether Ocwen should be found in contempt for violating the default orders in those seven cases.
Ocwen's position runs contrary to the well-recognized legal principle that notice to a party's attorney is imputed as notice to the party. See, e.g., In re Moore , 532 B.R. 614, 627-28 (Bankr. W.D. Pa. 2015). That principle is itself a corollary that flows from the general rule in agency law that adequate notice to or actual knowledge acquired by an agent is imputed to the principal. In re Linzer , 264 B.R. 243, 248 (Bankr. E.D.N.Y. 2001). The Supreme Court has rejected the argument made by some that this rule imposes an unjust penalty on the client, noting that the client
"voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice *806 of all facts, notice of which can be charged upon the attorney.' "
Link v. Wabash R. Co. , 370 U.S. 626, 633-34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (citation omitted). See also New York v. Hill , 528 U.S. 110, 115, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000) (the defendant is "deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' ").
The above having been said, the Court does have some reservations about extending this rule to the context of civil contempt for violation of an order of which the would-be contemnor denies having awareness. The imputation of knowledge to the client based solely on the attorney's awareness seems more akin to constructive notice and may be a difficult fit for the "actual notice" requirement for a finding of contempt. In researching the issue of whether a finding of contempt against the client can be made based on an attorney's notice of an order when the client denies having been made aware of that order, the Court notes the cases are few and not entirely consistent, but seem to evidence some reluctance to impute the attorney's knowledge to the client absent special circumstances. See, e.g., In Re Slaiby , 73 B.R. 442 (Bankr. D. N.H. 1987) (attorney's knowledge of discharge order would not be imputed to client for purposes of civil contempt); In Re Patterson , 111 B.R. 395 (Bankr. N.D. N.Y. 1989) (debtors could be held in civil contempt for violating an order that was served on their attorney, where any lack of knowledge by debtors was attributable to their own conscious choice to disengage from case); In Re Clayton , 2012 WL 11290 (Bankr. E.D. Tenn. 2012) (although the general rule is that knowledge of attorney is imputed to client, there are limitations to that - refusing to impute knowledge for civil contempt.)
Additionally, some courts have narrowed the imputable notice and knowledge rule by holding that for an attorney's knowledge to be imputed to the client it must pertain to the matter involved in the existing attorney-client relationship. See, e.g., In re Caffey , 384 B.R. 297, 307 (Bankr. S.D. Ala. 2008) (citing cases). In some of the seven cases in dispute, the attorneys who had entered an appearance on behalf of Ocwen had done so for a specific matter other than a notice of postpetition mortgage fees, expenses and charges, so service of the default order on them may not have fallen within the narrowed version of the general rule.
For the above reasons, the Court has decided not to impute to Ocwen the record attorneys' knowledge of the default orders in the seven instances where there was such attorney knowledge. In addition to the reasons given above, the Court is doing so because there are default orders of which Ocwen clearly did have knowledge based on other grounds, so there is no real need to press the attorney knowledge rule to its outer limits. The Court's conclusion here is based solely on the circumstances presented, however, and should not be viewed as a conclusion that an attorney's knowledge of an order can never be imputed to the client for purposes of a finding of civil contempt.[23]
The chart reproduced at Appendix "C" also shows that in two of the disputed ten *807 cases, i.e. , in Taper and Goldsby , a copy of the default orders was sent directly to Ocwen by first class U.S. mail at its office in West Palm Beach, Florida. In Taper , an employee of the Chapter 13 Trustee's office certified under penalty of perjury that a copy of the default order was mailed to Ocwen on April 28, 2017, at two separate addresses - Ocwen Loan Servicing, LLC, Attn: Bankruptcy Department, P.O. Box 24605, West Palm Beach, FL 33416-4605 and Ronald Faris, President, Ocwen Financial Corporation, 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409. See, Taper , Case No. 15-22731 at Doc. No. 44 filed on April 28, 2017. The Court notes that the first of these addresses matches the address that Ocwen itself listed when it filed Proof of Claim 21 in the Taper case on August 31, 2016. In Goldsby , the BNC Certificate of Notice filed under penalty of perjury states that the default order was mailed to Ocwen at Ocwen Loan Servicing, LLC, Attn: Bankruptcy Department, P.O. Box 24605, West Palm Beach, FL 33416-4605 on June 24, 2017, again, an address that Ocwen itself listed in Proof of Claim 6 filed on March 4, 2016. See Goldsby, Case No. 15-11102 at Doc. No. 60 filed on June 22, 2017.
Under the so-called "mailbox rule," these mailings to Ocwen raise a rebuttable presumption that the default orders were received by Ocwen in due course. See, e.g., In re Lienhard, 498 B.R. 443, 451 (Bankr. M.D. Pa. 2013). Once such presumption arises, the party challenging the presumption of receipt must present credible evidence demonstrating that the mailing was not in fact received. Ocwen presented no such evidence here beyond the bare assertion by Broome that the orders were not found in the Ocwen "system." Accordingly, the presumption was not rebutted and the Court concludes that Ocwen received copies of the default orders in Taper and Goldsby by mail in due course and thus had actual knowledge of such orders well before the latest possible dates previously noted.
To sum up, on the issue of Ocwen's "knowledge" of the 13 default orders that were entered against it in the Affected Cases, the Court finds that Ocwen had actual notice[24] of the default orders as follows:
*808 Case Date of Default Order Date of Ocwen Actual Notice Conway December 27, 2016 October 13, 2017 Hedlund December 28, 2016 August 11, 2017 Zumpano March 2, 2017 July 5, 2017 Ranko April 26, 2017 April 26, 2017 Makin April 26, 2017 April 26, 2017 Taper April 26, 2017 April 26, 2017 Battaglia April 26, 2017 July 5, 2017 McAteer May 22, 2017 July 17, 2017 Powers May 22, 2017 July 17, 2017 Gedda May 23, 2017 July 17, 2017 Shreffler May 30, 2017 May 30, 2017 Goldsby June 22, 2017 June 22, 2017 Baumgartner June 26, 2017 July 17, 2017
And, of course, as indicated above, Ocwen had actual notice of the July 26th Order and the September 1st Order on or about the dates those orders were issued.
(C) Ocwen's Disobedience of the Orders
(i) Disobedience of Default Orders
The Court can now turn to the final element necessary for a finding of civil contempt - whether Ocwen disobeyed any of the orders that are the subject of the OTSC. The default orders will be explored first since they are chronologically the earliest, and because the clarity of their language makes for an easier determination. The key language for purposes of the OTSC, appearing in all of the default orders, is the following directive:
ORDERED that Respondent [i.e., Ocwen] is to provide to the Court proof that the records have been adjusted to remove these charges no later than 60 days from the date of this Order. The proof must include a notarized affidavit by a corporate officer reflecting that the charges have been removed as well as full and comprehensible loan history from the inception of the loan.
(emphasis added) See Ranko Doc. No. 56, Makin Doc. No. 51, Shreffler Doc. No. 57, Taper Doc. No. 43, Goldsby Doc. No. 59, Battaglia Doc. No. 76, Zumpano Doc. No. 55, McAteer Doc. No. 59, Powers Doc. No. 70, Gedda Doc. No. 49, Baumgartner Doc. No. 49,[25] Hedlund Doc. No. 57, and Conway Doc. No. 67. It might also be pointed out that this provision of the default orders would have been no surprise to Ocwen. The Trustee's Objections themselves included *809 language to the effect that the Trustee was seeking loan histories, and the default orders that were entered were the proposed orders that the Trustee had filed with the Objections.
Thus, all of the various default orders clearly and explicitly required Ocwen to provide proof to the Court within 60 days, by way of a notarized affidavit, that the charges in the respective Notice had been removed and provide a "full and comprehensible loan history from the inception of the loan." This language is unambiguous, and the Court does not understand Ocwen to have ever disputed its meaning in this litigation. Nor did Ocwen ever seek clarification of any of these orders, seek reconsideration of any of these orders, seek modification of any of these orders, or take an appeal from any of these orders.
Given the above, the Court finds by clear and convincing evidence that Ocwen intentionally disobeyed the default orders entered in Ranko , Makin , and Taper , and that it may be found in civil contempt as to those orders. As to those three orders it is presumed Ocwen had actual knowledge of the Orders when they were issued and an obligation arose in it to provide proof of removal of the charges and a complete loan history from the inception of the loan by no later than June 25, 2017. The evidence established that Ocwen did absolutely nothing to even attempt to comply with those orders. As a result, the Trustee was required to file motions to compel in early July 2017. This was all well before the issuance of the July 26th Order and the initiation of what has become known informally as the Ransom/Randolph matter.
The Court will not find that Ocwen disobeyed any of the other default orders for purposes of imposing a sanction for civil contempt. The primary reason for this conclusion is the issuance of the July 26th Order, initiating the Ransom/Randolph matter. Although Ocwen never argued for such a broad interpretation, on further reflection and out of an abundance of deference to it in regard to the determination of sanctionable conduct, the Court concludes that the issuance of the July 26th Order could conceivably have led Ocwen to believe that any default orders whose deadline for response had not yet come due were being superseded.
At the very least, conceivably the issuance of the July 26th Order could have created some uncertainty regarding the status of the default orders. The Court does not really accept that premise since the July 26th Order says nothing about revoking or rescinding the default orders in any respect. However, in keeping with the "long-standing, salutary rule in contempt cases ... that ambiguities and omissions in orders redound to the benefit of the person charged with contempt," Frankford Tr. Co. v. Allanoff , 29 B.R. 407, 410 (E.D. Pa. 1983), the Court will restrain its skepticism and find that as to any of the default orders whose deadline for Ocwen to act had not yet passed when the July 26th Order was issued, Ocwen cannot be said to have disobeyed such orders and been in contempt of such orders.
Based on this approach, any default order that was issued after May 27, 2017, could not have been violated by Ocwen because the 60-day response period provided in such order would not yet have expired when the July 26th Order was issued. Thus, the default orders in Shreffler , Goldsby and Baumgartner were not violated.
The remaining seven default orders were all issued prior to May 27, 2017, and thus based solely on the language of those orders, the 60-day response period had expired and Ocwen would have been in violation of them before the July 26th Order was issued. There are other factors, *810 however, that must be considered here before a conclusion of contempt can be reached. As to the default orders in Conway and Hedlund , Ocwen did not have notice of them until after the July 26th Order was entered, so clearly it would be unfair to find Ocwen in contempt of those orders. Ocwen had notice of the default orders in McAteer , Powers and Gedda on July 17, 2017, which was of course before the July 26th Order was issued. The 60-day response deadline for those orders was almost up by the time Ocwen had notice, and then the July 26th Order was issued only a few days later. In these circumstances, even though the Court could find Ocwen to be in violation of those orders, it chooses not to do so.
The default orders in Battaglia and Zumpano are perhaps the most difficult of all to address. As to both of those default orders the 60-day response period had already expired before Ocwen had notice of them. Furthermore, Ocwen received notice on July 5, 2017, three weeks prior to the issuance of the July 26th Order. Ocwen thus had ample time to take action of some kind to show it was at least attempting to comply with those default orders, but instead it did nothing. A finding that Ocwen disobeyed these orders could easily be justified here, and the Court is tempted to do so because of the totality of evidence presented. Nevertheless, in keeping with its approach to give Ocwen the benefit of every conceivable doubt in this matter, the Court will find that Ocwen's first notice of the default orders in Battaglia and Zumpano was sufficiently close to the July 26th Order that its failure to comply with those orders will be excused.
(ii) Disobedience of July 26th Order and September 1st Order
An initial issue to be addressed with respect to these orders is whether the entry of the September 1st Order, with its new deadline of October 13, 2018, for Ocwen to supply the Trustee with complete loan histories, unconditionally expunged any then-existing violation of the July 26th Order by Ocwen, thereby in effect rendering the July 26th Order a nullity for contempt purposes, or whether the July 26th Order remained in effect to serve as a basis for a finding of contempt.[26] The Court concludes, for two reasons, that the July 26th Order remained in effect notwithstanding the issuance of the September 1st Order.
First, the September 1st Order contains several references to the July 26th Order and provides that Ocwen was to comply with all the requirements of that Order by the new deadline to the extent it has not already done so. That indicates the continuing vitality of the July 26th Order. Second, and perhaps more importantly, at the August 31st hearing that preceded the September 1st Order, the Court made abundantly clear that a failure to comply with the new order that was to be issued would mean that Ocwen would not be shielded from the consequences of any disobedience of the July 26th order:
The Court : ... Now again, just so you understand, no misunder-standing. This is a one time opportunity, this is a get out of jail free card. Okay? If Ocwen doesn't cooperate or comply - and it's up to Ocwen. If Ocwen doesn't want to, they think they have a case here, fine, but we're going to go through the sanction process - evidentiary hearing, sanction process with an *811 order to show cause for a violation of the clear terms of my July 25th order [i.e. , the July 26th Order].[27]
Thus, any "reprieve" from a violation of the July 26th Order that may have been granted in the September 1st Order was conditioned upon compliance with that latter order, and as will be discussed below, that did not happen.
Now that the status of the July 26th Order has been resolved, the Court can turn to the question of whether Ocwen should be found to have disobeyed the July 26th Order and/or the September 1st Order. In a sense, this is an easy question to answer since Ocwen has admitted that it did not comply with those Orders. For instance, at the OTSC hearing held on June 20, 2018, the following exchange occurred:
The Court : ... Do you believe you've complied with the court orders?
Mr. Messinger : No, Your Honor.[28]
And later:
The Court : - complying nine months later, in a modified manner-
Mr. Messinger : Is not compliance.
The Court : - is not compliance.
Mr. Messinger : I get that.
The Court: All right.
Mr. Messinger : I get that. And in fact, I'll tell you, just so you know I'm clear, is, if your order requires something by a certain date, and we didn't miss - and we missed that date, but we complied with it some other way, months and months later, we didn't comply with the order.[29]
The record as established at the June 20, 2018 evidentiary hearing and at the continued evidentiary hearing on July 31, 2018, is replete with undisputed evidence supporting a finding that Ocwen failed to provide complete loan histories[30] in the Affected Cases prior to the deadline for doing so as established in the July 26th Order and then the September 1st Order. The case-by-case accounting of such failings is laid out in exacting detail in the transcripts and exhibits, and it would serve no purpose to go through a recitation of all that detail here. It will suffice for present purposes to point to the Trustee's August 11, 2017 Report , October 13, 2017 Report , and her Exhibit A[31] as generally setting forth an accurate summation of Ocwen's non-compliance with the requirements of the July 26th Order and September 1st Order, respectively.
More appropriate for discussion here are the reasons provided by Ocwen for its failure to obey the two Orders. With respect to the July 26th Order, Ocwen argues that its failure to comply was the result of a misinterpretation of the requirements of that order. While issuing that Order calling for Ocwen to provide "a complete loan history" for each of the Affected Cases, the Court's intent and purpose was for Ocwen to provide an entire history of the loan from the date of its inception forward to the present - a view shared by the Trustee *812 and likewise reflected in all of the default orders discussed above. Ocwen claims that it understood the pertinent phrase to simply mean a loan history as would be relevant only in the context of a post-petition notice of mortgage fees, expenses and charges. Hence, Ocwen asserts that it acted accordingly and provided only partial loan histories.
As an initial matter, it is not even clear that "misinterpretation" is recognized as a defense in a contempt proceeding. It is true that some courts have recognized a "mistaken interpretation" defense. See, e.g., U.S. v. Trudeau, 812 F.3d 578, 593 (7th Cir. 2016) (recognizing defense in a criminal contempt proceeding). However, the Court is not aware that such a defense has been adopted by the Third Circuit, and it would appear to be contrary to the Rule in this Circuit that good faith is not a defense to civil contempt. In re AGR Premier Consulting, Inc., supra. Furthermore, even in those courts that have recognized such a defense, the party invoking it must show that the purported mistaken interpretation was plausible. Trudeau, supra.
The Court does not find Ocwen's alleged misinterpretation to be a plausible excuse for failing to comply with the July 26th Order such as would be conducive to a conclusion of no contempt. The meaning of the Order is plain enough on its face and the idiosyncratic interpretation put forward by Ocwen is not persuasive. Rather, it suggests an attempt by Ocwen to rationalize, after-the-fact, a knowing violation of the Order. At the very least, this interpretation evidenced a reckless disregard and/or indifference to the requirements of the Order. Furthermore, the undisputed evidence produced at the evidentiary hearing[32] revealed that as of the July 26th Order Ocwen had actual knowledge of the Court's intent in this regard.
There was evidence presented during the OTSC evidentiary hearing to show that the Trustee communicated her (correct) understanding that the July 26th Order required production of the loan histories from the inception of the loans to Ocwen's attorney in an email exchange that took place on July 28, 2017. Ocwen's attorney (Eisenberg) acknowledged the communication and stated that he would convey the Trustee's understanding to Ocwen. On July 27, 2018, Eisenberg sent an email to Amy Sabedra of the Trustee's Office stating that it was his belief that the July 26th Order required only the production of post-petition histories. Sabedra forwarded that email to the Trustee and on July 28, 2017 at 7:48 P.M., the Trustee sent a clarifying email to Eisenberg stating:
Steve - I want the histories from the inception of the loan and that is what the Judge ordered - Ronda.
Eisenberg affirmatively responded at 8:20 P.M. that same day, as follows:
Understood. I'll let them know. Have a great weekend. Steve.[33]
Eisenberg did not respond by stating that he or Ocwen disputed the Trustee's understanding of the July 26th Order or that their own, much narrower view of what it meant to produce a "complete loan history" was correct. By his acquiescence, Eisenberg conveyed that his understanding of what was required was now the same as the Trustee's. The Trustee's interpretation of the Order, now implicitly accepted by Eisenberg, was in harmony with the 13 *813 previously-entered default orders in the Affected Cases, all of which required loan histories going back to the "inception of the loan."
In these circumstances, if Ocwen actually did have a good faith belief in its narrow interpretation of the July 26th Order, the Court would expect Ocwen to have communicated that belief to the Trustee and tried to convince her that she was wrong, following which Ocwen or the Trustee could (or should) have sought clarification from the Court as to the meaning of the Order if necessary. What Ocwen could not do if it disagreed with the order was just choose to disobey it, even if that disobedience was accomplished under the guise of "complying" with the order by giving it a strained interpretation more to Ocwen's liking. As the Supreme Court has instructed:
We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.... The orderly and expeditious administration of justice by the courts requires that 'an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings ... Remedies for judicial error may be cumbersome but the injury flowing from an error generally is not irreparable, and orderly processes are imperative to the operation of the adversary system of justice.
Maness v. Meyers , 419 U.S. 449, 458-60, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) (citations omitted). Another court, citing Maness , had this to say about a lawyer who assisted a client in violating an order:
When a court issues a ruling, a lawyer must advise his client to comply and must not counsel disobedience. The opposite result, if sanctioned, could only result in the unraveling of the rule of law. There are few mandates so plain as the command to obey the order of the court. Nevertheless, petitioners gave comfort and counsel to disobedience, in lieu of review. Under such circumstances, we conclude that the imposition of sanctions was an appropriate act by the district court in defense of its authority.
Kleiner v. First Nat. Bank of Atlanta , 751 F.2d 1193, 1208 (11th Cir. 1985) (citation and footnote omitted; affirming fine of $ 50,000 imposed against attorney)
Had Ocwen followed the proper approach, any uncertainty could have been quickly eliminated, but unfortunately Ocwen chose to conceal its alleged "true interpretation" of the Order until it filed a response on August 21, 2017, to the Trustee's August 11, 2017 Report . The Court can only conclude that Ocwen unilaterally decided to intentionally proceed in this fashion knowing full well that its view of the Order was at worst, highly questionable[34] and disingenuous, or at the very least, it was acting in reckless disregard *814 and/or indifference to the requirements of the Order.
Testimony presented at the July 31st evidentiary hearing supports the former conclusion. James Broome, the Team Lead in Ocwen's Legal Department/Contested Bankruptcy Group, testified evasively and without credibility on the question of exactly who made the decision to provide only post-petition loan histories simply involving the period of Ocwen's servicing function to the Trustee in response to the July 26th Order. Nevertheless, the testimony remained clear enough to conclude that the final decision to treat the orders was made not solely by Ocwen's outside counsel (Eisenberg), but rather, by a "collection" of Ocwen employees, agents and/or professionals.
Overall, the testimony presented by Ocwen at the evidentiary hearings was muddled and did little to elucidate the decision-making process underlying Ocwen's response to the requirement in the July 26th Order for the production of "complete loan histories." During Broome's testimony the Court tried to pin down exactly how the decision to provide only post-petition loan histories had been made by Ocwen. To that end, the Court asked Broome directly whether anyone from Ocwen had asked Eisenberg what the July 26th Order required:[35]
The Court: - who made the decision that that's all you were to provide; did you ask Eisenberg for that advice?
Mr. Broome: Sir, I don't think we actually asked Eisenberg ... I don't remember asking Stern & Eisenberg if that's what we had to produce. We were just going on what we've done -
Later, in attempting to determine who the "we" Broome was referring to in his testimony, and whether Mulcahy played any role, the Court asked:
The Court: ... where did it come from that you decided to just produce in the context of the PPFN proceeding?
Mr. Broome: My - my appearance at the [July 24, 2017] hearing, listening to everything that was discussed, and my prior experience with dealing with this issue in this particular district, we produced what we always produced.
The Court: Okay. So it was your decision to do that.
Mr. Broome: It was - it was - I don't want to say it was a single decision. Listen, if I have to take the onus for this -
The Court: Somebody has got to tell me who did it.
Mr. Broome: If I have to take the onus for this, I will absolutely do so.
...
The Court: I just want to know the truth.
Mr. Broome: Yes
...
The Court: And all I want to know is what happened. It sounds like, from what you're saying, this was your call. Now was - did you run it by Mulcahy first, or did he - was he out of the loop?
Mr. Broome: No. This is - this was something that my team was handling, in connection with the Bankruptcy Department. And we produced the histories that we normally produce in these situations. There was no - we didn't sit back and consciously say, you know what, this is what we're going to produce. We kind of followed our standard procedure in what we *815 normally do in this jurisdiction for this type of matter.[36]
Thus, based on this testimony up to this point of the hearing, without more, the Court could easily conclude that Broome himself, possibly along with some unnamed members of his "team," made the decision on how to respond to the July 26th Order without any input by Eisenberg or Mulcahy. However, the following exchange later occurred between Broome and the Court:
The Court: Let me - did you ever consult counsel, Mr. Mulcahy or Mr. Eisenberg, as to what your duty was?
Mr. Broome: We ... we had consulted with Stern & Eisenberg about the hearing from July 24th. And the issue was brought up about loans going back to origination, so - and again, this went back to our experience, that-[37]
It is unclear what Broome's above response to the Court's question was referring to, but it certainly is inconsistent with the testimony that Broome had given earlier in the hearing. Possibly it is a reference to Eisenberg informing Ocwen of the Trustee's understanding of the July 26th Order and a decision by Ocwen to disregard that information and instead just supply what it "normally" did. Then, still later in Broome's testimony, under questioning by Ocwen's attorney, the following exchange occurred:
Atty. Messinger: How are legal decisions within Ocwen made?
Mr. Broome: By counsel.
...
Atty. Messinger: Okay. And would you ever make a decision on your own, as to how to respond to a certain court order?
Mr. Broome: No.
Atty. Messinger: Have you ever?
Mr. Broome: No.[38]
Thus, Broome's testimony as to who decided how to respond to the July 26th Order was all over the map. The Court therefore must conclude at the very least Mr. Broome was intentionally being evasive in response to the Court's direct questioning quite possibly intending to conceal the identity of who ultimately made the decision. Based upon the aggregate of his testimony coupled with the misleading statements contained in the affidavits he submitted as referenced above, the Court concludes Broome's testimony to lack overall credibility and the decision to controvert the Court's directive was made collectively by the Ocwen "team," i.e., Mulcahy, Eisenberg, Broome and possibly other unnamed/named participants.
Also testifying regarding the above was Peter Mulcahy, who at the time was acting as a senior counsel in the Compliance Department at Ocwen. Mulcahy testified that when outside counsel was hired on a particular matter, such counsel made decisions on the law and Ocwen had "full reliance" on such counsel.[39] This response suggests that, if Eisenberg had informed Ocwen as to the Trustee's understanding of what was meant by a "complete loan history," and assuming that Eisenberg himself did not express a disagreement with that interpretation, Ocwen would have supplied histories from the inception of the loans, but we know that did not happen in response to the July 26th Order. Mulcahy also testified that when an order *816 was issued in the Ransom/Randolph matter it would be discussed with senior Ocwen executive members, including himself, who would "take the recommendations of counsel and proceed ... from there."[40] It is difficult to square this testimony with that of Broome, who referenced no such meetings having happened.
Mulcahy also testified that he never even looked at the July 26th Order at the time it was issued, and that his only instruction to Broome with respect to it was to "provide for her [i.e. , the Trustee] what she wants."[41] But the Court can only conclude either that such instruction was not actually given by Mulcahy, or if it was given it was disobeyed by Broome, because it is undisputed that the Trustee wanted loan histories from the date of loan inception and had communicated such to Ocwen's attorney, but those were not provided. Of course, that presumes that Eisenberg did convey to Ocwen what the Trustee wanted, but whether or not he did so is not entirely clear. Mulcahy testified that he did not recall any conversations with Eisenberg to that effect,[42] did not know of the email exchange between Eisenberg and the Trustee[43] and that he did not recall whether prior to the issuance of the September 1st Order he "was ever aware ... or not" of the requirement of a loan history from the inception date.[44]
The last person to testify with any knowledge of why Ocwen responded to the July 26th Order in the way that it did was Eisenberg. He testified that after receiving the Trustee's email concerning the scope of the loan history production he "went back to the client" and "I said, here's the trustee's position."[45] Eisenberg then stated that the individuals at Ocwen he would have spoken to about it were Broome and someone he could only identify as "Sharon"[46] as well as Mulcahy[47] . When the Court tried to ascertain why the decision was made to produce only partial loan histories, and who was involved in making that decision, Eisenberg said, somewhat contradictory to Mulcahy's description of how the matter was handled, that he doesn't "get into the back end process at Ocwen, so I don't understand or ask about how the decision process was made behind Mr. Mulcahy; I didn't get involved with that process."[48]
In sum, the testimony provided by the "Ocwen people" as to why it responded to the July 26th Order in the manner it did, and observing their collective overall demeanor while doing so, is tortuous and contradictory to the point that the Court has no confidence in exactly what happened. The Court does find it more likely than not that Eisenberg did relay the Trustee's view to Ocwen, which means that someone at Ocwen, whether an individual or a group, consciously decided to disregard that interpretation of the July 26th Order and instead respond to it in another way - narrower and incorrectly. As to exactly who at Ocwen made that decision, those who know will not talk, and the Court cannot say.
Given Broome's testimony and the July 28th email exchange in which Eisenberg *817 responded to the Trustee without giving any pushback, confirming that he would be conveying the Trustee's expectation to Ocwen, the Court can only surmise that Eisenberg did just as he acknowledged he would at the August 31st hearing.[49] The Court can further conclude that Ocwen personnel, perhaps Broome alone, or perhaps a group that included Broome and others, decided to simply disregard that information and instead respond to the July 26th Order in the manner that they saw fit. That scenario is supported by the statements of Eisenberg at the August 31st hearing clearly demonstrating that he understood and interpreted the requirement in the July 26th Order to mean that complete loan histories were to be supplied in the same way that the Court had intended it.[50]
When both the Trustee and its own attorney were telling Ocwen the same thing regarding the meaning of the July 26th Order, and Ocwen chose to ignore them both, it is difficult for the Court to give any credibility to Ocwen's contention that it had failed to comply with the Orders simply due to a good faith misinterpretation. For all the above reasons, the Court does not find that contention at all credible.
Moreover, even if the Court assumes, contrary to its assessment of the evidence presented, that Ocwen was acting in good faith in responding to the July 26th Order, that would still not help Ocwen to escape a finding that it disobeyed that Order. This is so because, at the August 31st hearing held to address Ocwen's failure to comply with the July 26th Order, the Court made it crystal clear that Ocwen's interpretation of the July 26th Order was wrong, and that a complete loan history meant a history from the inception of the loan to the present.[51] Additionally, in granting the conditional "reprieve" contained in the September 1st Order, the Court made clear that Ocwen's failure to comply with the September 1st Order would also result in sanctions for violation of the July 26th order. By its own admission, Ocwen has not complied with the September 1st order, and the Court would so find in any event.
It is thus clear that Ocwen has disobeyed the July 26th Order, regardless of whether its initial "misinterpretation" of that Order is deemed to have been in good faith or not. Put somewhat differently, while the Court does not accept that Ocwen had a plausible, good faith misinterpretation of the July 26th Order at the time it was issued, Ocwen was disabused of that notion at the August 31st hearing and given a "get out of jail free" card to come into compliance with no consequences provided it acted timely.[52] Ocwen failed to do so and any possible good faith excuse evaporated.
Turning now to the September 1st Order, Ocwen does not have any defense to explain its non-compliance. The misinterpretation defense raised as to the July 26th Order, weak as it is, is not even available with respect to the September 1st Order because any possible uncertainty as to what was required of Ocwen was removed at the August 31st hearing. Indeed, the Court does not understand Ocwen to be *818 asserting a misinterpretation excuse as to the September 1st Order. Several other factors are present which lead the Court to conclude that Ocwen's non-compliance with the September 1st Order should be considered willful disobedience, or at the least reckless disregard of and/or indifference to the requirements of the Order.
First, it is telling that even though in the September 1st order Ocwen had been granted a "reprieve," and even though the Court generously gave Ocwen until October 13, 2017 to comply, Ocwen did not even begin supplying the Trustee with any of the loan histories until October 12, 2017. That fact alone greatly magnified the likelihood of the Order not being timely complied with because it obviously allowed no time for any follow-up discussion between Ocwen and the Trustee to try to resolve any issues about the loan histories prior to the hard deadline set by the Court. Ocwen never asked for extra time and never appealed the September 1st Order prior to the ill-fated appeal that was taken in January 2018.
Next, testimony by one of the Ocwen witnesses presented at the July 31, 2018 hearing indicated that even if Ocwen did not have a certain part of a loan history in its own database, and even if efforts to get the missing portion of the history from a prior servicer were not successful, there were other ways that were available to Ocwen to try to recreate the missing portion.[53] Despite the availability of these other options, there was no evidence presented to show that Ocwen ever attempted such steps in this matter prior to the October 13, 2017 deadline, leading the Court to conclude - and frankly, more evidence of at least its woeful indifference to the Court's orders even in the late stages of the process - that Ocwen used less than best efforts to secure loan histories as required by the September 1st Order.
Rather than raise any valid defense as to its disobedience of the September 1st Order, Ocwen has, at most, put forward some potentially mitigating factors to explain its non-compliance with the Order. However, those "factors" do not go to the issue of whether Ocwen disobeyed the Order and are more appropriately addressed in the next section of this Memorandum Opinion discussing an appropriate sanction. Also, before moving to its conclusions, the Court will take a brief digression to comment on the actions of the two attorneys most closely involved in this matter on the Ocwen side, Eisenberg and Mulcahy.
The Court has decided not to impose any personal liability on those individuals pursuant to the OTSC, but that is only because of conflicting evidence and a lingering uncertainty as to what really transpired in discussions they were involved in following the July 24, 2017 hearing and the July 26th Order. The decision not to impose personal liability on them, however, should by no means be viewed as a vindication, or as a sign that the Court believes they acted in conformity with the high standards rightfully expected of them as officers of the Court. In fact, quite to the contrary, and regardless of which version of the facts is accepted, the Court finds much in their actions to warrant judicial reproach.
In so concluding, the Court begins with one fact that is indisputable - as of July 28, 2017 upon receipt of the Trustee's "clarification" and other related information - Eisenberg clearly knew that the Court's intent in issuing the July 26th Order was to require Ocwen to produce loan *819 histories from the inception of the loans and he indicated he would pass that information along to Ocwen. The Court was presented with two different scenarios of what happened next.
In one, as promised, Eisenberg reported this to Ocwen, and someone at Ocwen - probably an individual in the group of Mulcahy, Broome and two other high ranking people named Patrick Cox and Kim Miller, or that group collectively - elected to disregard that information and instead simply respond to the July 26th Order as though it only required post-petition histories, with Eisenberg acquiescing in that decision. This version comes primarily from the representations Eisenberg made at the August 31, 2017 hearing and his testimony at the first evidentiary hearing, although there were also intimations of it in Broome's testimony at the second evidentiary hearing.[54]
In the alternative scenario, which was the dominant theme of the witnesses presented by Ocwen at the bifurcated evidentiary hearing, Eisenberg did not report the Trustee's understanding to Ocwen, and Ocwen simply attempted to comply with the July 26th order based on its own interpretation of what was required.[55]
Under either of these scenarios, Eisenberg's conduct would be problematic. If he did report to the Ocwen people and they disagreed with the July 26th Order, the proper course would have been to advise Ocwen to seek clarification or reconsideration of the Order, or even to take an appeal if necessary. By "looking the other way" and going along with Ocwen's strained interpretation that he himself in all likelihood knew was incorrect,[56] Eisenberg put his own professional conduct and reputation at risk. If Ocwen insisted on acting under an interpretation of the July 26th Order that he knew was wrong, Eisenberg could have chosen to withdraw from representation at that point. See Pa. R.P.C. 1.6(b)(4) (declining or terminating *820 representation when client insists upon taking action that the lawyer considers repugnant). By instead advocating for Ocwen's position in the circumstances presented, Eisenberg was in essence not being candid with the Court, and acting contrary to the basic principle that court orders must be obeyed. See, generally, Pa. R.C.P. 3.3(b), (c) ; 3.5(d) ; 8.4(c), (d) ; and Maness v. Meyers , supra .[57]
Regarding the second scenario, if Eisenberg did not report the Trustee's view to Ocwen, after saying that he would, and after knowing how strongly she felt about it (not to mention the Court itself) coupled with his actual knowledge prior to this time of the content of similar language contained in the default orders entered by the Court in the Affected Cases, then the Court is at a loss in seeking to understand why he failed to do so.
As far as Mulcahy, Ocwen's in-house attorney, there is no good alternative for him either. If he was an active participant in a scheme to subvert the July 26th Order by willfully misinterpreting it, rather than take the ethically appropriate step of forthrightly challenging an order with which his client disagreed, then his conduct was no better than Eisenberg's, and perhaps even worse since he was acting while hidden in the shadows. On the other hand, if he was the passive figure that he tried to portray himself as in his testimony,[58] then he did not serve the interests of his client and did not fulfill his basic duties as an attorney.
It is both dispiriting and unpleasant for the Court to make these comments as to the conduct of Eisenberg and Mulcahy in this matter. However, the Court feels the obligation to do so out of concern for the integrity of the judicial process. While no monetary sanctions are being imposed against those two individuals, the Court assumes that its straight-forward assessment of their respective roles in this matter will be motivation enough for them to avoid ever finding themselves in this kind of situation again. With that observation *821 out of the way the Court can proceed with the main thread of its discussion and its overall conclusion.
(D) Conclusion as to Contempt
To summarize the preceding discussion, the Court finds by clear and convincing evidence that the default orders issued in thirteen of the Affected Cases, i.e., those underlined and identified with double asterisks in Appendix "B," as well as the July 26th Order and September 1st Order issued under the above caption, were all valid orders. The Court further finds by clear and convincing evidence that Ocwen had actual knowledge of and disobeyed the default orders issued, at least, in the Ranko, Makin and Taper cases. The Court further finds by clear and convincing evidence that Ocwen had actual notice of and disobeyed the July 26th Order and the September 1st Order. Finally, the Court finds by clear and convincing evidence that, based on these findings, Ocwen should be found in civil contempt and sanctioned for its disobedience of and failure to comply with the respective Orders.
(E) Sanction
Now that the Court has found Ocwen in civil contempt for its disobedience of the default orders in Ranko , Makin , and Taper , and the July 26th and September 1st Orders, it must decide on an appropriate sanction to impose. Once a finding of civil contempt has been made, the Court has considerable discretion in fashioning a remedy. In re Odom , 570 B.R. 718, 722 (Bankr. E.D. Pa. 2017), In re Free , 466 B.R. 48, 57 (Bankr. W.D. Pa. 2012). Broadly speaking, a sanction for civil contempt must either coerce compliance with the order in question, or compensate the opposing party for the damages it suffered as a result of the contempt. Gregory v. Depte , 896 F.2d 31, 34 (3d Cir. 1990). Coercive sanctions can include the imposition of a fine or in terrorem damages. Odom, supra . If a sanction is tied to past conduct, only, it cannot be coercive, and thus must be solely compensatory. Gregory, supra .
In the present case, the Court finds that a coercive sanction is not appropriate because sufficient evidence has been presented to establish that Ocwen has now complied with all of the various Orders, at least to the extent it is able to do so.[59] Thus the sanction here will be compensatory *822 only, and will relate to the "damage" that the Trustee and the Debtors have incurred due to Ocwen's disobedience of the Orders, which as a practical matter means attorney fees and expenses, only, since no other evidence was presented to show how those Parties were damaged in any other way.
With respect to the attorney fees incurred, the Parties entered into a Stipulation that was filed one day prior to the July 31st continuation of the evidentiary hearing. See Ransom , Doc. No. 175 and Randolph Doc. No. 267. The Stipulation provides and the Parties agree that the Trustee and the Debtors' Counsel, from mid-March of 2017 through conclusion of the Ocwen appeals, incurred agreed upon attorney fees of $ 70,000 in connection with this matter. The Court probed the Parties about this Stipulation at the beginning of the hearing and was satisfied that it had been knowingly entered into, and that it was not intended as a concession by Ocwen that compensatory damages should be awarded.
Under the circumstances in which the stipulated amount was initially presented, the Court observed that in its view, if compensatory damages were to be awarded, then the $ 70,000 figure should be the amount of attorney fees, rather than just a cap or maximum, as Ocwen initially argued. To consider the Stipulation otherwise would simply place a cap on the potential relief accorded to the Trustee which the Court understands was not her intent in entering the Stipulation and would be contrary to the intended overall benefit for entering such a Stipulation, that is, to avoid the need for exacting examination of the actual attorney time and expense related to litigating the sanctionable conduct, if any, by the Trustee. After some limited initial opposition Ocwen agreed to that understanding, and the Trustee did as well.[60]
Now that the hearing has been completed and the evidence heard, and after having given the matter some additional thought, the Court is no longer certain that the $ 70,000 stipulated figure should be treated as a set amount rather than a cap. The Court is now at least willing to consider the possibility that the sanction to be imposed should be something less than the full $ 70,000 because of the existence of some potentially mitigating factors that were not made apparent to the Court prior to the beginning of the July 31, 2018 portion of the evidentiary hearing. Again, while in no way excusing Ocwen's disobedience of the Orders, such factors may potentially be taken into consideration when determining an appropriate sanction. See, e.g., In re Nicole Gas Production, Ltd., 519 B.R. 723, 735 (Bankr. S.D. Ohio 2014) (good faith is not a defense to a finding of civil contempt, but it may in certain circumstances serve to mitigate the sanctions imposed for the contempt); In re Barnicle , 800 F.Supp. 1021 (D.N.H. 1992) (defendant found to be in contempt for failing to appear as witness when subpoena required, but fact that witness eventually did appear was a mitigating factor that could be considered when fashioning remedy).
In the present case and with the benefit of the testimony, the Court now perceives more clearly a number of potentially mitigating factors. One is the continuing effort by Ocwen, along with its attorneys, to meet the requirements of the July 26th and *823 September 1st Orders following the October 13, 2017 deadline for doing so. These efforts - again, while in no way excusing Ocwen for ignoring the Orders in place or failing to timely seek modification if it felt the scope of the Orders problematic - took the form of meetings and telephone calls between the Trustee and members of her staff on the one side, and representatives of Ocwen on the other, that occurred during the period of October through December in 2017. The Trustee testified that these calls and meetings were to discuss the loan histories in individual cases, and that she would actually submit questions in advance to the Ocwen people and Ocwen would then report back on them. This sort of activity going on after the missed deadline seems to provide some indication that, while not actually complying with the Orders, Ocwen was at that point at least not stubbornly defying them and was making some effort to move toward compliance, albeit late.
Another possible mitigating factor, and related in an obverse way to the first, is that the Trustee was by all indications a willing participant in these post-deadline attempts by Ocwen to come into compliance. Ocwen points out that in her November 28, 2017 filing with the Court the Trustee represented that Ocwen had by then "complied" with the requirement to produce complete loan histories. See Trustee's Motion to Extend Time for Response to Court at ¶ 3, Ransom Doc. No. 93, Randolph Doc. No. 179. The Trustee now asserts that statement was mistaken, but at a minimum that motion indicates the Trustee was satisfied enough with the process that was occurring that she was willing to ask the Court to allow it to continue.
A large portion of the Trustee's testimony on July 31, 2018, related to a series of meetings between her office and Ocwen that took place from October through December in 2017 to discuss Ocwen's compliance with the Orders, so some of those meetings occurred even after the Trustee's Motion had been filed, perhaps right up to the time the OTSC was issued.[61] Presumably the Trustee would not have voluntarily agreed to those meetings unless she thought Ocwen was making some effort to comply.
In fact, the overall effect of the Trustee's testimony, and as specifically reflected in the above cited passages from the hearing transcript, was that she was not as concerned about Ocwen's failure to timely meet the Court's third extension of time to allow Ocwen to fully comply with its order as she was with ultimately obtaining her requested documentation. Apparently the Trustee believed the document exchange process was moving forward in a positive direction and an additional 60 days to secure Ocwen's compliance with the Court's directive was not unreasonable. This lack of concern about the timely conclusion of the process was further evidenced in her November 28, 2017 Motion to Extend Time filed in each case - which for reasons unrelated to the Trustee's apparent acquiescence as to the pace of the document exchange process, was the impetus for entry of the Court's December 21st OTSC - whereby she sought an extension into 2018, for Ocwen to "finally" comply with the Court's September 1st Order.
It is for this reason the Court must pause before unilaterally imposing the previously *824 agreed upon $ 70,000 monetary sanction. Of course, based solely on the Parties' prior assent to the Stipulation , the Court could proceed to take that step. However, since it is the Court's understanding that the $ 70,000 figure contained therein is based upon attorney fees expended by the Trustee and the Debtors' counsel from mid-March 2017 to the time of the final disposition of the case,[62] and ultimately to be paid to them, an issue of fairness arises not previously considered by the Court in granting the Stipulation . If the Trustee, and presumably Debtor's Counsel, were proceeding in a collaborative spirit with Ocwen and content with the progress of the document exchange process through November 28, 2017 - even if the Court was not - and would have been so content continuing through February 1, 2018, is it now appropriate for the Trustee and Debtors' Counsel to be compensated as beneficiaries of a monetary sanction from Ocwen, on attorney fees and costs expended during that same time period?
An additional mitigating factor may arise in that the Court has not found Ocwen to be in contempt of all the various orders that are the subject of the OTSC because of a lack of actual knowledge as to some of the default orders, and the overall folding of the default orders into the Ransom/Randolph matter pursuant to the July 26th and September 1st Orders.
The Court must stress that it has by no means concluded that $ 70,000 is not an appropriate figure for the compensatory sanction award to be imposed against Ocwen, it is merely now open to the argument that it should be something less. Before finally issuing a decision in this matter, the Court intends to hear evidence and argument on that point and is prepared to schedule a hearing for that purpose, followed by a quick decision. Before taking that step, however, the Court will allow the Parties some time to confer and discuss whether they might prefer to work out an acceptable figure for the sanction award among themselves, or perhaps agree to attempt mediation for that purpose.
In the Court's view, this entire episode could easily have been avoided. But through initial carelessness, and indifference, a relatively minor matter was allowed to ultimately turn into outright disobedience of the various Court Orders leading to almost two years of litigation and countless hours of judicial and lawyer time. It is too late for Ocwen to undo the damage thereby caused, but the Court at least had some hope that the matter could serve as a cautionary tale to prevent such a recurrence in the future. The Court thus anticipated it would hear some testimony at the evidentiary hearing from Ocwen concerning tangible steps it has taken to assure that, going forward, orders would *825 be received and obeyed, or properly challenged rather than disregarded or questionably misconstrued. Unfortunately, very little was provided along those lines and the Court comes away with no great optimism that Ocwen has learned any lesson by all this. Hopefully the Court is wrong in its assessment but only time will tell.
AND NOW , this 28th day of March, 2019 , for the reasons stated in the foregoing Memorandum Opinion portion of this matter, it is ORDERED, ADJUDGED and DECREED that,
(1) The Order to Show Cause ("OTSC") issued on December 21, 2017, at Doc. No. 94 in Ransom and at Doc. No. 180 in Randolph, is VACATED as to Peter Mulcahy , James Broome , and Steven Eisenberg .
(2) Ocwen Loan Servicing, LLC ("Ocwen") is found to be in civil contempt of the Court for disobeying the Orders issued:
(a) On April 26, 2017 at Doc. No. 56 in Ranko , Case No. 15-23197-CMB;
(b) On April 26, 2017 at Doc. No. 51 in Makin , Case No. 15-23054-GLT;
(c) On April 26, 2017 at Doc. No. 43 in Taper , Case No. 15-22731-GLT;
(d) On July 26, 2018 at Doc. No. 64 in Ransom and Doc. No. 148 in Randolph, in the within matter; and,
(e) On September 1, 2018 at Doc. No. 85 in Ransom and Doc. No. 172 in Randolph, in the within matter.
(3) As a sanction for its contempt, Ocwen will be required to compensate the Chapter 13 Trustee ("Trustee") and Debtors' Counsel Daniel Foster ("Foster") for the attorney fees and expenses incurred by them in their efforts to compel Ocwen to comply with the Orders in question, in an amount still to be determined, but subject to a maximum amount of $ 70,000, allocated in the previously agreed upon ratio of 6-to-7 to the Trustee and 1-to-7 to Foster.
(4) No punitive sanction will be awarded.
(5) The exact amount of the compensatory sanction will be determined by the Court following a further evidentiary hearing that will be limited solely to that issue, at which hearing the Court will begin with the presumption that $ 70,000 is the proper figure for the sanction but that it may be reduced based on mitigating circumstances, with Ocwen bearing the burden of proof as to any such mitigating circumstances, provided however , that the Court will defer scheduling such hearing for a brief time pursuant to Paragraph 6, below, of this Order.
(6) On or before April 11, 2019, the Parties may advise the Court that they have:
(a) Voluntarily reached an agreement as to the amount of the sanction;
(b) Wish to attempt mediation to try to reach a voluntary agreement on the amount of the sanction; or,
(c) Wish the Court to proceed to the assessment of the appropriate monetary sanction in which event the Court will issue a further order as appropriate prior to scheduling any evidentiary hearing pursuant to Paragraph 5, above.
(7) So as to insure that the Parties understand that the within Order is not intended by the Court as a final order for purposes of appeal, until such final order is entered setting forth the amount of the sanction against Ocwen, this matter shall be considered interim and incomplete. Upon the issuance of such final order, any and all other issues beyond the yet to be determined amount of the sanction, that may remain open in the within matter, will be deemed concluded and/or moot.
*826 TIMELINE OF KEY EVENTS
3/14/17 Trustee files Objection to Ocwen's Notice in Ransom
3/17/17 Trustee files Objection to Ocwen's Notice in Randolph
4/19/17 Ocwen files Responses in Ransom stating that the Notices were filed as the result of a "technical error"
4/24/17 Ocwen files Responses in Randolph stating that the Notices were filed as the result of a "technical error"
5/23/17 Trustee and Ocwen file proposed settlement
5/24/17 First hearing held on Objections; Court refuses to approve settlement at that time because of unanswered questions and says it will schedule an evidentiary hearing to determine if the error occurred in any other cases.
5/31/17 Orders issued scheduling evidentiary hearing and requiring representatives from Ocwen and RAS to personally appear.
7/17/17 Trustee files Supplemental Reports indicating she had found 30 cases in which Ocwen filed Notices in error for RAS fees, and that she had raised objections and obtained default orders in a number of the other cases
7/24/17 Evidentiary hearing held; James Broome appears as Ocwen representative; nature of error explained
7/26/17 July 26th Order entered under dual caption; Ocwen directed to provide complete loan histories in Ransom, Randolph, and the other cases identified in the Trustee's Supplemental Report by 8/4/17; Trustee to respond by 8/11/17 stating whether she is satisfied that Ocwen has complied.
8/4/17 Ocwen files Affidavits in Affected Cases attaching "post-petition loan payment history."
8/11/17 Trustee files Report Concerning Ocwen's Response and Motion to Compel and for Additional Sanctions, arguing that Ocwen has not provided complete loan histories as required by the July 26th Order.
*827 APPENDIX "A"
8/15/17 Order issued directing Ocwen to respond to the Trustee's 8/11/17 Report by 8/21/17, and scheduling a further hearing for 8/31/17.
8/21/17 Ocwen files Response to Trustee's 8/11/17 Report explaining stating that for cases in which a proof of claim had been filed it supplied a post-petition loan history, and for cases where no proof of claim was filed it supplied a loan history from the date it began servicing the loan.
8/31/17 Hearing held
9/1/17 Order issued reiterating that Ocwen was to supply complete loan histories, and giving it additional time to do so until 10/13/17, with Trustee to also report by that date as to whether she believed Ocwen had complied; Trustee to also file a further report by 12-1/17 as to her review of the materials provided.
10/13/17 Trustee files Report Concerning Ocwen's Compliance with September 1, 2017 Order of Court, indicating that she had received complete loan histories in only a few of the cases.
10/18/17 Ocwen files response to Trustee's 10/13/17 Report indicating that it was in the process of reviewing that Report and was "working with the Trustee"
11/28/17 Trustee files motion seeking an extension of time to file her report due on 12/1/17.
12/21/17 OTSC issued, as well as an Order scheduling a hearing on the Trustee's motion to extend time. Hearing as to both scheduled for 1/24/18.
1/4/18 Ocwen files notice of appeal of OTSC, July 26th Order, August 15th Order and September 1st Order.
3/2/18 District court issues order dismissing appeal and remanding
3/29/18 Ocwen files motion for reargument and reconsideration in District Court
5/15/18 District Court denies Ocwen's motion *828 APPENDIX "B"
Appendix-Affected Cases (Cases with underline and double asterisks are those in which the Trustee had filed an objection and a default order was entered)
(1) Ransom 15-10886-TPA
(2) Randolph 15-10895-TPA
(3) Hoeritz 15-22899-GLT
(4) Taylor 15-22463-CMB
(5) White 15-10873-TPA
(6) Cancelmi 15-24157-GLT
(7)Battaglia 15-23085-CMB**
(8)Makin 15-23054-GLT**
(9)Taper 15-22731-GLT**
(10)Zumpano 15-23523-CMB**
(11)Ranko 15-23197-CMB**
(12)McAteer 15-23230-CMB**
(13)Shreffler 15-10722-TPA**
(14)Powers 15-23430-CMB**
(15)Gedda 15-23448-JAD**
(16)Baumgartner 15-23897-CMB**
(17)Goldsby 15-11102-TPA**
(18) DeBoe 15-11175-TPA
(19) DiCola 15-23016-GLT
(20) Borlak 15-23207-JAD (3 notices)
(21) Kelly 14-70858-JAD
(22) Murray 15-22423-CMB
(23) Petrosky 15-22431-JAD
(24) Tysarczyk 15-22417-CMB
(25) Brisky 15-23464-GLT
(26) Matson 15-23241-CMB
(27) Burgess 15-23195-JAD
(28) Thompson 15-23272-JAD
(29)Hedlund 15-22395-JAD**
(30)Conway 15-22405-GLT**
(31) Lucia 16-20637-JAD
*829 APPENDIX "C"
*830 --------

For convenience, attached to the Opinion at Appendix "A" is a "timeline" showing the key events that have occurred in this matter.

Although the Trustee styled these as "Objections," the technically correct filing would have been a motion. See, Fed.R.Bankr.P. 3002.1(e) . The Court has long had the policy of disregarding this sort of error of form so long as substantive rights are not affected. See Fed.R.Bankr.P. 9005 , incorporating Fed.R.Civ.P. 61 (court to ignore errors that do not affect substantial rights). In more recent filings of this kind the Trustee has used the proper motion form.

The evidentiary hearing had originally been scheduled for June 26, 2017, but upon motion by Ocwen it was continued to July 24, 2017.

As will be discussed further below in the Memorandum Opinion , a few additional Affected Cases were subsequently discovered and added to the group, which explains why the lists in the Trustee's July 17thReport and Appendix "B" do not exactly match.

It will be noted that a majority of the Affected Cases are assigned to other Judges of this Court. Because of the similarity of the issues involved in all of the Affected Cases it was agreed by the Judges, collectively, that the Undersigned would be designated to handle them as a group and rule on behalf of the Court as a whole.

At the hearing, for some reason Ocwen repeatedly stressed this distinction apart from use of the original phrase "technical error" as alleged in its pleadings.

The Trustee has long taken the position that loan histories are needed in connection with the resolution of disputed Notices so that she can review them to ensure that fees, expenses or charges appearing in the Notices that should not have been charged to the debtor have been completely removed from the loan records, and that no other improper charges have been imposed. The Court generally agrees with that view in the appropriate case and has included such a requirement in its orders resolving disputed Notices for a considerable period of time.

In fact, during the July 24th hearing, the Court noted at several times during the colloquy with Eisenberg and Broome that "significant" sanctions would be imposed if they and/or Ocwen again failed to timely comply with any future Court orders. See Transcript of Hearing on July 24, 2017, at p. 14-16, l. 20-5; p. 27-28, l. 22-25; p. 27, l. 5-8; p. 29-30, l. 17-25; p. 31, l. 1-5.

The July 26th Order was actually signed on July 25th, but was not docketed until July 26th. It has been referred to variously as the "July 25th Order" and the "July 26th Order" throughout this proceeding. The Court herein will refer to it as the "July 26th Order" to be consistent with the terminology used by the District Court when the matter was on appeal.

The Court agrees that the Affidavits were at best, misleading and at worst, misrepresentations, by using the word "complete" in conjunction with the limited post-petition information Ocwen was providing, whereas the July 26th Order has no such qualification or limitation with respect to the complete loan history it required.

The September 1st Order was actually signed on August 31, 2017, but was not docketed until September 1st. It has been referred to variously as the "August 31st Order" and the "September 1st Order" throughout this proceeding. The Court herein will refer to it as the "September 1st Order" to be consistent with the terminology used by the District Court when the matter was on appeal.

The October 13th deadline for Ocwen to provide complete loan histories set forth in the September 1st Order was not changed or extended by Ocwen's Response to the Trustee's October 13th Report . If Ocwen wanted to seek an extension of the deadline it was required to do so by motion. See Fed.R.Bankr.P. 9013 . The Response was not a motion. Even if the Court were to deem it a motion, the Response was not filed until 5 days after the October 13th deadline, which means Ocwen would have had to show that its failure to act by that deadline was the result of "excusable neglect," which it failed to do. See Fed.R.Bankr.P. 9006(b)(1) . Finally, and in any event, even if Ocwen had filed a motion seeking an extension of its October 13th deadline, and done so on or before the deadline, this decision whether to extend the deadline is discretionary with the Court. Id. Thus, if Ocwen ignored the October 13th deadline in the hope that the Court would go along with a proposed extension, it was acting at its own peril. If Ocwen wanted to be sure as to a deadline extension, the proper procedure would have been to file a motion before the deadline, either sufficiently far in advance so that in the normal course a hearing would be held before the deadline, or by seeking an expedited hearing if the circumstances justified such treatment.

To be clear, the Court did not "overlook" the Trustee's November 28th Motion as posited by Ocwen in its proposed Finding of Fact No. 28 . See Ransom Doc. No. 220, Randolph Doc. No. 301. The impetus for issuing the December 21st OTSC was the Court's extreme disappointment in Ocwen's continued and apparent "slow playing" of the process, as described in the November 28th Motion, in light of the prolonged history of his matter.

Also listed in the notice of appeal was the August 14, 2017 Order, previously mentioned, wherein the Court had scheduled the August 31st hearing.

See W.D.Pa. Civil Nos. 18-21 and 18-22, entered on the bankruptcy docket at Ransom Doc Nos. 129 and 130, and, Randolph Doc Nos. 210 and 211.

For the sake of completeness, the Court further notes that at the hearing in the bankruptcy appeal Ocwen also raised a new issue of whether the "case or controversy" jurisdictional requirement is met in this case. The District Court did not consider that argument, but indicated that Ocwen was free to raise it on remand. Ocwen has not raised that issue on remand and thus appears to have waived it and the Court, being satisfied of its jurisdiction, does not further consider it here.

The Court is aware that there might exist other grounds for the imposition of sanctions here, such as the power to sanction for unreasonable and vexatious multiplication of proceedings under 28 U.S.C. § 1927. The Court chooses not to explore any of these other grounds because it finds civil contempt to be most well-suited under the facts presented. Another possible ground to impose sanctions would be criminal contempt, which is generally viewed as a punitive sanction to vindicate the authority of a court. There seems to be a split among the circuits on the question of whether a bankruptcy court has the power to impose sanctions for criminal contempt. The Third Circuit has not definitively ruled on this issue, though most lower courts within this Circuit have found that a bankruptcy court lacks that power. See, e.g., In re Vaso Pharmaceuticals, Inc. , 514 B.R. 416, 422 (Bankr. D. Del. 2014). In any event, without thereby ruling on this question, the Court chooses not even to consider criminal contempt in the present case.

See n. 2, above.

The Trustee also filed motions to compel in the Makin and Ranko cases, but since Ocwen admits having received the default orders in those cases, there is no need to consider them further.

See Transcript of Hearing on July 31, 2018 at 195, l. 16 through 196, l. 3.

See Trustee's Motion to Compel and for Sanctions , Taper Doc. No. 45 (filed and served on July 6, 2017), Battaglia Doc. No. 78 (filed and served on July 5, 2017), and Zumpano , Doc. No. 58 (filed and served on July 5, 2017).

The certificate of service indicates that this report was served on Attorney Miller of the Stern and Eisenberg firm.

It would have been appropriate at some point in the evidentiary hearing for Ocwen to provide some testimony as to the remedial measures it has taken with attorneys it retains to assure that, future validly entered court orders would be timely transmitted to it or at least would be communicated to it so that it could timely act consistent with a court's directive. Unfortunately, no such testimony/evidence was offered.

At least for purposes of a contempt proceeding the words "notice" and "knowledge" are often used interchangeably. The Court here presumes that notice of an order implies knowledge of the contents of such order. See, e.g., Matter of Batla , 12 B.R. 397, 399 (Bankr. N.D. Ga. 1981) (notice of filing of bankruptcy petition constitutes the knowledge required to support a finding of contempt).

The default order in Baumgartner also includes an additional sentence at the end of this paragraph, stating "The proof should also include actual time spent and hourly rates."

Ocwen has not raised, argued or briefed this issue but the Court addresses it solely for the sake of completeness.

See Transcript of Hearing, August 31, 2017 at 28, Ransom Doc. No. 91, Randolph Doc. No. 177.

See Transcript of Hearing on June 20, 2018 at 26, Ransom Doc. No. 158, Randolph Doc. No. 251.

Id. at 54-55.

That is, complete loan histories from the inception of the loan taken out by the debtor.

The Trustee's Exhibit A is a document entitled "Joint Summary of Events of Compliance" that was agreed to by both the Trustee and Ocwen. Exhibit A goes through a detailed summary of the documents that have been produced by Ocwen and, on a case-by-case basis, when they were produced.

The reference to "evidentiary hearing" being used herein is in the aggregate and includes the record from the June 20th an July 31st hearing dates.

See Trustee's Exhibit E. See also Transcript of Proceeding dated July, 31, 2018 at 38-39, Ransom Doc No. 191, Randolph Doc No. 282.

Another reason why the narrow interpretation of the July 26th Order advanced by Ocwen was questionable is that it would represent a retreat from the default orders, which had explicitly required a loan history going back to inception of the loan. By issuing the July 26th Order the Court was, in essence, escalating the entire issue of Notices filed by Ocwen yet, according to Ocwen's theory, at the same time relaxing Ocwen's obligation to provide relevant information on the issue. Simply as a matter of logic, such a theory makes no sense.

See Transcript of Hearing on July 20, 2018 at 71, l. 13 - 20.

Id. at 80 l. 17 through 81 l. 6, 81 l. 22-23, 82 l. 1-12.

Id. at 104 l. 3-9.

Id. at 127 l. 14-15, 19-23.

Id. at 135, l. 17-25.

Id. at 138, l. 21-24.

Id. at 141 l.19-21.

Id. at 156 l. 20 through 157 l. 15.

Id. at 161 l. 9-10.

Id. at 172 l. 15-20.

Id. at 208 l. 14-15.

Id. at 209 l. 10-13.

Id. at 212 l. 9-12.

Id. 213 l. 24 through 214 l. 2.

Eisenberg's testimony came across as intentionally vague on this subject. See Transcript of Hearing on August 31, 2017 at p. 8, l. 5-14; p. 9, l. 7-21; p. 10, l. 4-13. Ransom Doc. No. 91, Randolph Doc. No. 177.

Id. at 12-13.

See, e.g., Id. at p. 20, l. 9-13. ("And when I say complete loan history, the order speaks for itself; complete loan history. Not as from the time that Ocwen got it or how Ocwen views it, or however in the context of what you think how this case arose.")

Id. at 28 l. 10-22.

See Transcript of Hearing on July 31, 2018, at 265, l. 15 through 266, l. 19.

See Transcript of Hearing on August 31, 2017 at 13, l. 1-15, Transcript of Hearing on July 31, 2018 at 208, l. 8-15; 213 l. 23- 214, l. 3; and 301, l. 1-304, l. 1.

See, e.g., Transcript of Hearing on June 20, 2018 at 71, l. 13-20; 80, l. 17-23; 150, l. 13-20; 157, l. 6-15, 170, l. 8 through 24; 171, l, 3; 172, l. 15-22; 176, l. 11-16.

Eisenberg stated at the August 31, 2017 hearing that coming out of the July 24th hearing his understanding of the requirement to produce complete loan histories was the same as the Trustee's, and as the Court intended. See Transcript of Hearing on August 31, 2017, at 12 line 25 through 13, line 15. However, in his testimony during the June 20, 2018 portion of the evidentiary hearing Eisenberg testified that he did not have a clear understanding coming out of the July 24th hearing as to what was meant by "complete," and that his understanding did not become 'solidified" until after he spoke with the Ocwen people. Transcript of Hearing on June 20, 2018 at 250, l. 20 through 251, l. 3. The Court strongly suspects the earlier statement to be nearer the truth. Although the Court did not use the term "inception of the loan" at the July 24, 2017 hearing, it did state that Ocwen was to "get the full loan history to the Trustee." Transcript of hearing on July 24, 2017 at 27, l. 7-8 (emphasis added). There was also reference made at that same hearing to its default orders and to the fact that the 60-day response period had already passed in some of them. The Court, in reference to that, stated "you've got to get that loan history." Id. at 28, l. 10-11, which in context obviously meant the complete histories as required by the default orders and not just some truncated version that Ocwen preferred to produce. Eisenberg, being present at the hearing and closely involved in the dispute is very likely to have understood exactly what was required. Furthermore, it appears clear to the Court that under the circumstances presented, Eisenberg knew what documents the Court intended for Ocwen to produce and Eisenberg's feigned excuse for proceeding in a different direction as part of his "litigation position" (See Ocwen Proposed Findings of Fact # 77, Ransom Doc. No. 220, Randolph Doc. No. 301) lacks credibility.

Indeed, it can be argued that Eisenberg had a duty to withdraw from representation if he advised Ocwen what needed to be done to comply with the July 26th Order and Ocwen refused to do so. Pa.R.P.C. § 1.16(a)(1) requires an attorney to withdraw from representation if the representation will result in a violation the Rules of Professional Conduct or other law. As the main text indicates, several provisions of the Rules of Professional Conduct are potentially implicated if an attorney goes along with a client's strained interpretation of the requirements of an order when he knows that interpretation is incorrect and not what the court that issued the order intended. Such conduct by an attorney might be characterized as abetting the client's "fraudulent conduct related to the proceeding," prohibited by Pa.R.P.C. § 3.3(b) , or as engaging in "conduct intended to disrupt a tribunal," prohibited by Pa.R.P.C. § 3.5(d) , or as engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation," prohibited by Pa. R.P.C. § 8.4(c) , or as engaging in "conduct that is prejudicial to the administration of justice," as prohibited by Pa.R.P.C. § 8.4(d) . By referencing Eisenberg's conduct and potential obligations the Court is not making a finding that Eisenberg did violate any of these provisions by failing to withdraw from representing Ocwen because that is not its role here. Nevertheless, the Court believes it appropriate to note, at this juncture that, at the very least it would seem that Eisenberg should have been sensitive to the possibility that he might need to withdraw if he was in fact put in a position of advocating for an interpretation of the July 26th Order that he knew to be invalid. Notably, the record does not reflect any such concern on his part.

For example, Mulcahy testified that he never even took the time to read the July 26th Order, which is quite stunning to the Court considering that the matter was important enough to involve a discussion among four fairly high-ranking Ocwen employees and the company's outside counsel. See Transcript of Hearing on June 20, 2018 at 148, l. 12-24; 151, l.24 through 152, l. 3.

During the evidentiary hearing, considering the practicalities of the situation and not in any way excusing Ocwen for failing to comply with the clear intent and scope of its prior orders, the Court modified the original production requirement of a "complete loan history" for certain cases where Ocwen and the respective debtor had entered into a loan modification during the pendency of the bankruptcy. (In the Proposed Findings of Fact that were submitted following the evidentiary hearing, Ocwen erroneously refers to this change as a clarification, which it clearly was not. Ocwen Proposed Findings of Fact # 37 , Ransom Doc. No. 220, Randolph Doc. No. 301). Since at the time of the loan modification Ocwen and the respective debtor had essentially agreed on the renegotiated loan obligation value, no further need existed for a review of Ocwen's pre-modification accounting of the obligation. Had Ocwen made a timely request for such a modification after receiving the July 26th and September 1st Orders rather than simply ignoring its duties arising from those Orders, the Court most likely would have seriously entertained such an approach thereby significantly avoiding the situation in which Ocwen currently finds itself. Furthermore, in light of this consideration allowed by the Court at trial, the Parties have stipulated that Ocwen is now in compliance with the Orders in all Affected Cases except four. See Trustee's Exhibit A. In Battaglia Ocwen has not produced the loan history from July 1997 through September 2000. In DiCola Ocwen has not produced the loan history for January 2013. In Murray Ocwen has not produced the loan history from May 1999 through August 2003. In Burgess Ocwen has not produced the loan history from November 2001 through April 2002. Based on the evidence presented, the Court is satisfied that Ocwen has now exhausted all reasonable efforts as to those four cases, and it would serve no proper purpose to require Ocwen to do anything further to try to locate the still missing portions of the loan histories.

See Transcript of Hearing on July 31, 2018 at 20, l. 22 through 21, l. 20.

See Id. at 50, l. 22-25 (referring to meetings that occurred between October and December in 2017), 166 l. 8 through 167 l. 2 (referring to a phone call between the Trustee and Ocwen scheduled for sometime after December 15, 2017); Transcript of Hearing on June 20, 2018 at 102, l. 17-23 (referring to phone calls between Ocwen and the Trustee going through December 2017).

The Stipulation filed by the Parties indicated that the $ 70,000 attorney fee figure was for "the beginning of time to the date of final disposition." That same understanding was repeated by Ocwen's Counsel at the July 31, 2017 hearing. The Court notes that on its face this period of time would seem to imply the inclusion of attorney fees incurred by the Trustee in connection with Ocwen's prior appeal. Nothing in the Stipulation and nothing said at the July 31st hearing is to the contrary. This could be potentially problematic as an abstract matter because the Court is not certain it has the power to award attorney fees that were incurred on the appeal, or whether that would be exclusively within the province of the District Court. In any event, given the Parties' Stipulation the Court finds that it need not make that determination here based on the premise that either (a) despite the stated time period, implicitly the Stipulation does not include attorney fees related to the appeal, or (b) the Parties' consent obviates any issue as to this Court's power to award attorney fees related to the appeal.